314 Ga. 109
FINAL COPY

S22A0093.  McIVER v. THE STATE.

BOGGS, Presiding Justice.

At a 2018 jury trial, Claud Lee "Tex" McIver III was convicted of felony murder and other crimes arising out of the shooting death of his wife, Diane McIver.[1] He appeals, asserting among other enumerations of error that the trial court erred in refusing his request to charge the jury on the lesser grade of involuntary

---

[1] The shooting occurred on September 25, 2016. McIver was originally indicted in April 2017; on August 22, 2017, he was reindicted for malice murder (Count 1), felony murder (Count 2), aggravated assault (Count 3), possession of a firearm during the commission of a felony (Count 4), and three counts of influencing a witness (Counts 5-7). McIver was tried before a jury from March 5 to April 23, 2018. The trial court granted a directed verdict of acquittal as to two counts of influencing a witness, and the jury found McIver not guilty of malice murder but guilty of felony murder, aggravated assault, the firearm possession charge, and the remaining count of influencing a witness. On May 23, 2018, McIver was sentenced to serve life in prison for felony murder, five years in prison for influencing a witness concurrently with the felony murder conviction, and a suspended concurrent sentence of five years on the firearm charge. The aggravated assault merged with the felony murder count. McIver filed a timely motion for new trial, which was amended on February 3, 2020, and March 10, 2020. After a hearing on October 23, 2020, the motion was denied on July 2, 2021. McIver's notice of appeal was filed on July 6, 2021, and amended on July 13, 2021. The case was docketed in this Court to the term beginning in December 2021 and orally argued on January 19, 2022.

manslaughter under OCGA § 16-5-3 (b) and in allowing the State to introduce allegedly inadmissible and prejudicial evidence and make improper comments during closing argument.

We conclude that the trial court erred in refusing McIver's request to charge on the lesser grade of involuntary manslaughter, because the charge was authorized by law and some evidence supported the giving of the charge. We further conclude that the failure to give the charge was not harmless error, because we cannot say that it is highly probable that this error did not contribute to the jury's verdicts. We therefore reverse McIver's convictions for felony murder and possession of a firearm in the commission of a felony.[2] We do not decide issues that are unlikely to recur if the State elects to retry McIver, but we do address certain evidentiary issues. We see no abuse of discretion in admitting some of the challenged evidence, but other evidence lacked relevance or its probative value was substantially outweighed by the danger of unfair prejudice, so

---

[2] McIver does not enumerate any error on appeal with respect to his conviction for influencing a witness, which is therefore affirmed.

2

that unless the evidentiary posture changes for any retrial, that evidence should not be admitted again.

1. *The evidence at trial.*[3]

The evidence presented at trial showed the following: Late in the evening of September 25, 2016, McIver, Diane, and Diane's close friend, Dani Jo Carter, were on their way back from a weekend at the McIvers' property in Putnam County, driving to Diane's condominium in the Buckhead area of Atlanta after a stop for dinner in Conyers. Carter testified that she was driving, Diane was in the front passenger seat, and McIver was in the rear passenger seat, at times conversing and at other times asleep. Carter was not aware of any argument or disagreement between Diane and McIver that weekend or during the drive.

When they got onto the Downtown Connector in Atlanta, traffic was heavy, and Carter said they needed to get off the interstate and

---

[3] Because in this case we must consider whether the trial court's error was harmful and therefore requires reversal, we review the evidence in some detail and not only in the light most favorable to the jury's verdicts. See *Strong v. State*, 309 Ga. 295, 295 (1) n.2 (845 SE2d 653) (2020).

go up Peachtree Street. Diane said something to McIver, but he did not respond, and Diane told Carter to get off at the Edgewood Avenue exit. After they exited the interstate, McIver said, "Girls, I wish you hadn't done this. This is a really bad area," and asked Diane to hand him his gun from the center console. Diane handed him the gun, a .38-caliber revolver, which was not in its holster, which was also in the center console, but rather in a plastic grocery bag.

Diane instructed Carter to turn onto Piedmont Road and continue north. Carter assumed that McIver had fallen asleep again, because he did not join in their conversation. Sometime later, they were stopped at a traffic light on Piedmont Road, at 14th Street, when Carter heard several clicks and asked what Diane was doing; she responded that she was locking the doors. At that moment Carter heard a loud "boom," and Diane swung around and asked, "Tex, what did you do?" McIver responded that "the gun discharged." Carter saw the gun in McIver's hand, pointing down, still in the plastic bag. The bullet passed through the back of the front

4

passenger seat, striking Diane in the back.

McIver instructed Carter to drive to Emory University Hospital on Clifton Road.[4] At the hospital, when asked how the shooting occurred, Diane told doctors it was an accident. Carter told the police it was "a horrible accident." Diane died during surgery as a result of internal injuries to her spine, pancreas, kidney, and stomach.

According to some witnesses at the hospital, at times McIver did not appear to be upset or grieving. The State presented evidence that McIver told the police that he fell asleep with the gun in his lap and the gun fired, and that he made statements at the hospital that the gun discharged accidentally when the car went over a bump. The State also presented testimony from a nurse who was not involved in treating Diane, who said that she was passing by in the hospital

---

[4] Although the State argued at trial that Emory Hospital is farther than Grady Memorial Hospital from the scene of the shooting, the actual distances were never established. Moreover, while evidence was presented that Grady is better equipped to treat gunshot wounds, during oral argument in this Court, the State's counsel acknowledged that no evidence was presented that McIver believed that Grady was so equipped or that he intentionally directed Carter to drive to Emory to avoid going to Grady.

hallway when she overheard McIver say, "I was cleaning my gun in the bathroom when I shot her." McIver later told a friend that there had been a "car accident" and Diane had died. He made several statements within the hearing of police officers and others indicating that he "could not go to jail," that he knew "how these things can go down," and that "this doesn't look good." McIver also told Carter to say that she had just come to the hospital as a family friend, but she told him she could not lie.

A firearms examiner for the State determined that McIver's double-action .38-caliber revolver was in good working order and, due to the internal hammer block, could not have discharged without the trigger being pulled. The trigger pull was either 2¼ pounds with the hammer cocked or 12¼ pounds with the hammer uncocked. An accident reconstruction expert for the State examined the pistol and the vehicle and testified, based on the trajectory of the bullet, that McIver did not have the pistol in his lap but was holding the pistol in a raised position, above the plane of his lap, at the time it was fired. But an expert for the defense also examined the pistol

6

and the vehicle and concluded, to the contrary, that the trajectory and the limited space in the rear seat made it "physically impossible" for the gun to have been held upright, and that the bullet's path showed that the gun was lying on its side resting on McIver's lap when it discharged. McIver also elicited testimony from a State's witness that McIver suffered from a sleep disorder that could cause him to make involuntary movements if he was startled awake.

The State presented a substantial amount of evidence regarding the McIvers' financial circumstances. McIver and Diane were married in 2005, a second marriage for both of them. McIver was a partner at a large Atlanta law firm; Diane was wealthy and an active business owner, the president of one real estate business and an owner or part owner of three other businesses. The McIvers kept their business interests and sources of income separate. Diane owned a condominium in Buckhead, and the McIvers owned a rural property in Putnam County, referred to as "the ranch," where they spent most weekends. They covered the expenses for their own

properties, but Diane funded some improvements to the ranch. Before their marriage, Diane loaned McIver $750,000. At the time of the marriage, McIver gave Diane her ownership interest in the ranch, which they held as joint tenants with right of survivorship. In 2011, one of Diane's companies loaned McIver an additional $350,000 through a promissory note secured by the ranch property. The note was renewed in 2014, payable in 2017 or on demand within 90 days. If the property was foreclosed on, Diane as sole owner of the lending company could have deeded full title to the property to herself.

McIver executed a will in 2005, providing that his interest in the ranch would go to Diane if she survived him, and the residue of the estate would go to one of his adult children. Diane executed a will in 2006 that contained substantial bequests to McIver and established a trust for his benefit. Diane had no children but was very close to the McIvers' godson. Her will was executed before their godson was born and so did not include him, but several witnesses testified that she wished to leave the ranch to him. The State

8

presented evidence that McIver and Diane disagreed about how the ranch should be disposed of after both of them died. Codicils to Diane's will were prepared in 2007 and in 2009 or 2010 but were never executed.[5] McIver executed a codicil to his will in 2009, which reiterated that Diane was to receive all of his interest in the ranch if he predeceased her. An attorney testified that between 2009 and 2011, McIver and Diane discussed executing new wills with him. McIver later made several appointments for the couple to discuss the contents of the new wills, but cancelled them. The attorney testified that no new wills were ever prepared.[6]

---

[5] The State elicited testimony from a neighbor and friend of the McIvers that approximately three years before Diane's death, she told the witness that she had made changes to her will to remove some beneficiaries. Diane's attorney testified that he had prepared a codicil in 2007 to remove a female friend with whom Diane had had a falling out, and to add several individuals including the McIvers' godson as beneficiaries, but that codicil was never executed. Neither of the two attorneys who worked for the McIvers on estate matters testified to the contents of the second codicil, and it was not admitted into evidence.

[6] No testimony was presented as to the contents of any new will, and no such will was ever found. The only evidence regarding even the existence of a second will was the testimony of a witness who worked in Diane's office that approximately two years before Diane's death, Diane told the witness that a document the witness had copied for her was "my new will." The witness did not look at the contents of the document, but she testified that it was somewhere between two and ten pages long. Diane's 2006 will was 19 pages

9

The State also presented evidence suggesting that McIver was experiencing financial difficulty as a result of his impending retirement from his law firm. He had recently become an "income partner," which meant that he was paid a set salary rather than a share of profits. His financial position had been worsening for several years, and he had told friends that he did not have enough money to cover expenses. The State presented testimony that Diane had regularly transferred money to McIver, that he would have had a negative cash flow but for those transfers, and that before Diane's death, McIver's net worth was approximately $1.5 million, but after her death, it increased to between $5.9 million and $6.9 million. Several months after Diane's death, McIver sold her furs, jewelry and other personal items through an auction company. According to the attorney for the estate, he recommended the sale to pay cash bequests specified in Diane's will, as well as expenses of and claims against the estate.

---

long, while the unexecuted 2007 codicil is five pages long.

The trial took place over a seven-week period in March and April 2018. The State asserted that McIver committed malice murder and felony murder based on aggravated assault, while McIver contended that Diane's death was caused by an accident. The jury was charged on the indicted crimes and also involuntary manslaughter in the commission of an unlawful act as a lesser included offense of malice murder and felony murder, but not on involuntary manslaughter in the commission of a lawful act in an unlawful manner as a lesser included offense. The jury deliberated for more than four days, sending numerous notes to the trial court, including a request to inspect the vehicle involved, which was arranged. On the fifth day of deliberations, the jury sent a note indicating that it was unable to reach a verdict as to intent on the indicted counts of malice murder, felony murder, aggravated assault, and influencing a witness. After an extended discussion with counsel, the trial court gave the jury a slightly modified pattern

*Allen* charge.[7] The jury then returned its verdicts, finding McIver not guilty of malice murder but guilty of felony murder, aggravated assault, influencing a witness, and possession of a firearm in the commission of a felony.[8]

2. *Refusal of requested charge on OCGA § 16-5-3 (b).*

McIver contends that the trial court erred in refusing his written request to instruct the jury on the lesser grade of involuntary manslaughter pursuant to OCGA § 16-5-3 (b).[9] We

---

[7] See *Allen v. United States*, 164 U. S. 492 (17 SCt 154, 41 LE 528) (1896); Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases § 1.70.70 (4th ed. 2007) (Jury (Hung)).

[8] The verdict form provided blanks for each count of the indictment, and the jury was instructed that under "Count 1 (Murder)" and "Count 2 (Felony murder)," it had the option for a finding of "Guilty of involuntary manslaughter" as a lesser included offense, and both counts contained such a blank. The jury did not mark either of those blanks.

[9] OCGA § 16-5-3 provides in its entirety:

(a) A person commits the offense of involuntary manslaughter in the commission of an unlawful act when he causes the death of another human being without any intention to do so by the commission of an unlawful act other than a felony. A person who commits the offense of involuntary manslaughter in the commission of an unlawful act, upon conviction thereof, shall be punished by imprisonment for not less than one year nor more than ten years.

(b) A person commits the offense of involuntary manslaughter in the commission of a lawful act in an unlawful manner when he causes the death of another human being without

12

agree.

The offense of involuntary manslaughter can be committed in two ways: causing the death of another without any intention to do so "by the commission of an unlawful act other than a felony," OCGA § 16-5-3 (a), which is a felony, or "by the commission of a lawful act in an unlawful manner likely to cause death or great bodily harm," OCGA § 16-5-3 (b), which is a misdemeanor.[10]

In extended discussions during the charge conference, the trial court stated:

> [W]e have three tiers of potential culpability. If the jury were to find that Mr. McIver were merely criminally negligent for holding a loaded gun pointed at his wife's

---

any intention to do so, by the commission of a lawful act in an unlawful manner likely to cause death or great bodily harm. A person who commits the offense of involuntary manslaughter in the commission of a lawful act in an unlawful manner, upon conviction thereof, shall be punished as for a misdemeanor.

[10] We note that, while the terms "felony" and "misdemeanor" are sometimes used to distinguish the provisions of OCGA § 16-5-3 (a) and (b), that terminology should not be used before the jury. See *Johnson v. State*, 261 Ga. 236, 239 (5) (404 SE2d 108) (1991). See also Paul M. Kurtz and Robert E. Cleary, Jr., Criminal Offenses and Defenses in Georgia 844 (2019 ed.) (suggesting the terms "unlawful act" involuntary manslaughter and "criminal negligence" involuntary manslaughter). Hereafter in this opinion, we will use the statutory language of "unlawful act" and "unlawful manner" to differentiate the two offenses.

13

back in a car, then we'd be talking about misdemeanor involuntary manslaughter [i.e., OCGA § 16-5-3 (b)]. If it is, in fact, [the crime of] reckless conduct, then it's felony involuntary manslaughter [i.e., OCGA § 16-5-3 (a)]. And then if it was an intentional act, then it's as charged.

But the night before closing arguments, the trial court informed the parties that it would not give the instruction on the misdemeanor form of involuntary manslaughter — the commission of a lawful act in an unlawful manner.[11] With respect to the homicide counts, the court instructed the jury on malice murder, felony murder based on aggravated assault, unlawful act involuntary manslaughter under OCGA § 16-5-3 (a) based upon the offense of "reckless conduct," see OCGA § 16-5-60 (b),[12] and accident.

---

[11] Before closing arguments began, the trial court noted that it had sent the revised charge to counsel via e-mail. McIver's counsel objected to the omission of an instruction on OCGA § 16-5-3 (b), asserting that reckless conduct and negligent conduct were different, and the trial court noted that "you and I disagree," but gave no explanation.

[12] OCGA § 16-5-60 (b) provides:

A person who causes bodily harm to or endangers the bodily safety of another person by consciously disregarding a substantial and unjustifiable risk that his act or omission will cause harm or endanger the safety of the other person and the disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation is guilty of a misdemeanor.

14

In its order denying McIver's motion for new trial, the trial court only briefly addressed the question of the jury instruction on unlawful manner involuntary manslaughter:

> Defendant, in his requests to charge, sought to have the Court charge the jury on misdemeanor involuntary manslaughter (OCGA § 16-5-3 (b)), arguing that some evidence supported a finding that, in killing his wife, Defendant engaged in a lawful act in an unlawful manner. The Court found both that the record did not support such a charge and that the pertinent case law disallowed such a charge. See, e.g., *Manzano v. State*, 282 Ga. 557, 559 [(651 SE2d 661)] (2007). Having reviewed the post-trial arguments of both parties, the Court maintains the position articulated at trial that a charge on misdemeanor involuntary manslaughter was supported neither by the record nor existing precedent and thus that [it] was not error to exclude such a charge from the instructions provided to the jury.

McIver argues that there was, at a minimum, slight evidence that he was engaged in a lawful act (which he describes as falling asleep with a gun on his lap in the back seat of a vehicle) in an unlawful manner (that is, in a criminally negligent manner likely to cause death or great bodily harm) when the gun inadvertently

---

The amendment to the statute that will take effect on July 1, 2022 does not alter subsection (b) except to add the words "or her."

discharged and killed Diane. He therefore contends that the trial court erred in denying his written request to charge the jury on unlawful manner involuntary manslaughter. The State argues that the trial court properly declined to instruct the jury on unlawful manner involuntary manslaughter, relying upon decisions such as *Manzano* to contend that any defendant who handles a gun with fatal results, even if unintentional, "has necessarily committed the misdemeanor of reckless conduct." (Citations and punctuation omitted.) 282 Ga. at 559 (3) (a).

To resolve this dispute, we must look first to the extensive history of the law of involuntary manslaughter, including the changes made by the General Assembly in altering that law and other related statutes in its general revision of the Criminal Code in 1968. We must always consider statutory text in its context, "which includes the structure and history of the text and the broader context in which that text was enacted, including statutory and decisional law that forms the legal background of the written text." (Citations and punctuation omitted.) *Seals v. State*, 311 Ga. 739,

740-741 (1) (860 SE2d 419) (2021).

We conclude from our review that Georgia has a long-established, statutory homicide offense of involuntary manslaughter, with two grades: first, the felony offense of involuntary manslaughter in the commission of an unlawful act other than a felony, and second, the misdemeanor offense of involuntary manslaughter in performance of a lawful act but with criminal negligence. This distinction was retained by the General Assembly in the 1968 revision of the Criminal Code. We further conclude that the element of criminal negligence in unlawful manner involuntary manslaughter is distinguishable from ordinary negligence on the one hand and from the mental state required for statutory reckless conduct on the other, and that the law does not forbid the giving of an instruction on unlawful manner involuntary manslaughter in every case involving a firearm. Finally, slight evidence authorizing the refused instruction was presented at trial, and we cannot say that it is highly probable that the error did not contribute to the jury's verdict.

(a) *History of the involuntary manslaughter statute.*

The distinction in Georgia between the two grades of involuntary manslaughter dates back to the 1816 Penal Code. See Ga. L. 1816, p. 142. There, the offense of manslaughter was defined as follows:

> § 5. Manslaughter, is homicide in the second degree. Manslaughter is the killing of a human creature without malice, express or implied, and without any mixture of deliberation whatever. It must be voluntary, upon a sudden heat of passion; or involuntary, in the commission of an unlawful act, or a lawful act, without due caution and circumspection.

After §§ 6 and 7, which further defined voluntary manslaughter and its prescribed punishment, involuntary manslaughter was further defined as follows:

> § 8. Involuntary manslaughter, shall consist in the killing of a human being, without any intention to do so; but in the commission of an unlawful act, or a lawful act, which probably might produce such a consequence.
> § 9. Involuntary manslaughter, in the commission of an unlawful act, shall be punished by confinement or labor, or solitude in the penitentiary, for a term not less than six months, and not longer than three years.
> § 10. Involuntary manslaughter, in the commission or performance of a lawful act, where there has not been observed necessary discretion and caution, shall be

18

punished by confinement or labor, or solitude in the penitentiary, for a term not less than three months, and not longer than one year.

Ga. L. 1816 at pp. 147-148.

With the enactment of the 1817 Penal Code, § 8 of the involuntary manslaughter statute was revised to include the first reference to "unlawful manner," as well as to add a provision in effect describing felony murder:

Involuntary manslaughter, shall consist in the killing of a human being, without any intention to do so; but in the commission of an unlawful act, or a lawful act, which probably might produce such a consequence, in an unlawful manner: *Provided always*, that where such involuntary killing shall happen in the commission of an unlawful act, which in its consequences naturally tends to destroy the life of a human being, or is committed in the prosecution of a felonious or riotous intent, the offence shall be deemed and adjudged to be murder.[13]

Ga. L. 1817 at p. 96. See also Oliver H. Prince, A Digest of the Laws

---

[13] The second clause, as later modified by the 1833 Penal Code, was removed in 1968 when a separate felony murder statute was enacted, now OCGA § 16-5-1 (c). For a history of felony murder statutes in Georgia, see generally *Shivers v. State*, 286 Ga. 422, 425 (1) n.3 (688 SE2d 622) (2010) (Nahmias, J., concurring specially).

19

of the State of Georgia 347 (1st ed. 1822).[14] The language used to define the elements of the two grades of involuntary manslaughter was carried forward through subsequent codes unchanged. Although the relevant Code sections were revised in some respects in the Code of 1933,[15] they continued in force until the general

[14] Available at University of Georgia School of Law, Historical Georgia Digests and Codes, https://digitalcommons.law.uga.edu/ga_code/6 .

[15] Former 1817 Penal Code § 5 was enacted as Code of 1933 § 26-1006:

> Manslaughter is the unlawful killing of a human creature, without malice, either express or implied, and without any mixture of deliberation whatever, which may be voluntary, upon a sudden heat of passion, or involuntary, in the commission of an unlawful act, or *a lawful act without due caution and circumspection*.

(Emphasis supplied.) Former 1817 Penal Code § 8 was enacted as Code of 1933 § 26-1009:

> Involuntary manslaughter shall consist in the killing of a human being without any intention to do so, but in the commission of an unlawful act, *or a lawful act, which probably might produce such a consequence, in an unlawful manner*: Provided, that where such involuntary killing shall happen in the commission of an unlawful act which, in its consequences, naturally tends to destroy the life of a human being, or is committed in the prosecution of a riotous intent, or of a crime punishable by death or confinement in the penitentiary, the offense shall be deemed and adjudged to be murder.

(Emphasis supplied.) The Code of 1933 combined former 1817 Penal Code §§ 9 and 10 as Code of 1933 § 26-1010:

> **Punishment for involuntary manslaughter.—** Involuntary manslaughter, in the commission of an unlawful act, shall be punished by confinement and labor in the penitentiary for not less than one nor longer than three years. Involuntary manslaughter, *in the commission or performance of a lawful act,*

revision of the Georgia criminal statutes in 1968.[16]

The 1968 revision was intended "to revise, classify, consolidate, and supersede the present laws relating to crimes and the punishment therefor and to establish new laws relating thereto" and "to provide a new Criminal Code." Ga. L. 1968, p. 1249. It was initiated by the appointment of a Criminal Law Study Committee tasked with revising the criminal statutes to address "problems which have arisen due to ambiguities and inconsistencies in the present law." Ga. L. 1961, pp. 96, 98; see also *Patterson v. State*, 299 Ga. 491, 505 (2) (b) (789 SE2d 175) (2016) (Blackwell, J., dissenting).

The 1968 Code consolidated the statutes pertaining to manslaughter: it eliminated Code of 1933 § 26-1006 defining manslaughter generally. It retained one section defining voluntary manslaughter, Ga. Code Ann. § 26-1102, and one defining

*where there has not been observed necessary discretion and caution,*
shall be punished as for a misdemeanor.
(Emphasis supplied.)
[16] The maximum penalty for unlawful act involuntary manslaughter was increased in 1951 to imprisonment for five years. See Ga. L. 1951, p. 737.

involuntary manslaughter, Ga. Code Ann. § 26-1103 (a) and (b). See Ga. L. 1968 at pp. 1276-1277.[17] It also removed the language in the involuntary manslaughter statute referring to felony murder, and enacted a separate statute defining felony murder, Ga. Code Ann. § 26-1101 (b), now OCGA § 16-5-1 (c). See Ga. L. 1968 at p. 1276.[18]

Significantly for our analysis, in the 1968 revision the General Assembly also created a new, misdemeanor offense, denominated "reckless conduct," Ga. Code Ann. § 26-2910. See Ga. L. 1968 at pp. 1325-1326.[19]

---

[17] When the Official Code of Georgia Annotated was adopted in 1982, the 1968 revision, Ga. Code Ann. § 26-1103, was carried forward as OCGA § 16-5-3. The definitional language was unchanged, other than the removal of two commas, but the language prescribing the penalty was reworded. The maximum penalty for unlawful act involuntary manslaughter was increased in 1984 to imprisonment for ten years. See Ga. L. 1984, p. 397.

[18] Ga. Code Ann. § 26-1103 (a), unlawful act involuntary manslaughter, further specified that the unlawful act must be "other than a felony," removing possible ambiguity or inconsistency with respect to the felony murder statute.

[19] As originally enacted, Ga. Code Ann. § 26-2910 provided:

A person commits a misdemeanor when he causes bodily harm to or endangers the bodily safety of another person by consciously disregarding a substantial and unjustifiable risk that his act or omission will cause the harm or endanger the safety, and the disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.

Ga. Code Ann. § 26-2910 was carried forward into the Official Code of Georgia Annotated as OCGA § 16-5-60. The text, as amended in 1988 and 2003, is now

(b) *Statutory construction.*

In interpreting statutes, we "presume that the General Assembly meant what it said and said what it meant." (Citations and punctuation omitted.) *Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013). And in determining a statute's meaning,

> we apply the fundamental rules of statutory construction that require us to construe the statute according to its terms, to give words their plain and ordinary meaning, and to avoid a construction that makes some language mere surplusage. We must also seek to effectuate the intent of the Georgia legislature. OCGA § 1-3-1 (a). In this regard, in construing language in any one part of a statute, a court should consider the entire scheme of the statute and attempt to gather the legislative intent from the statute as a whole.

(Citations and punctuation omitted.) *Coates v. State*, 304 Ga. 329, 330-331 (818 SE2d 622) (2018). "It is a basic rule of construction that a statute . . . should be construed to make all its parts harmonize

---

found at OCGA § 16-5-60 (b), which, as noted above, provides:

> A person who causes bodily harm to or endangers the bodily safety of another person by consciously disregarding a substantial and unjustifiable risk that his act or omission will cause harm or endanger the safety of the other person and the disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation is guilty of a misdemeanor.

23

and to give a sensible and intelligent effect to each part, as it is not presumed that the legislature intended that any part would be without meaning." (Citation and punctuation omitted.) *Gilbert v. Richardson*, 264 Ga. 744, 747-748 (3) (452 SE2d 476) (1994). And "[c]ertainly our legislature is presumed to enact statutes with full knowledge of existing law, including court decisions." (Citation and punctuation omitted.) *Roberts v. Cooper*, 286 Ga. 657, 660 (691 SE2d 875) (2010).

Moreover, "[f]or context, we . . . look to the other provisions of the same statute, the structure and history of the whole statute, and the other law — constitutional, statutory, and common law alike — that forms the legal background of the statutory provision in question." (Citation and punctuation omitted.) *Tibbles v. Teachers Retirement System of Ga.*, 297 Ga. 557, 558 (1) (775 SE2d 527) (2015). And it is "a core principle of statutory interpretation that changes in statutory language generally indicate an intent to change the meaning of the statute." (Citation and punctuation omitted.) *Middleton v. State*, 309 Ga. 337, 345 (3) (846 SE2d 73) (2020).

24

(c) *The revision of the involuntary manslaughter statutes.*

In the 1968 revision, the General Assembly retained the distinction between involuntary manslaughter in the commission of "an unlawful act" and in the commission of "a lawful act in an unlawful manner." But it removed the language "without due caution and circumspection" and "where there has not been observed necessary discretion and caution," and altered "which probably might produce such a consequence," i.e., the death of another human being, to "likely to cause death or great bodily harm." Presuming significance to these textual changes, as we must, we conclude that the 1968 revision, true to its expressed aim, removed inconsistent or ambiguous language that had defined the offense of unlawful manner involuntary manslaughter in language that suggested mere civil or ordinary negligence.[20]

---

[20] For prior use of the same or similar language in civil contexts, see, e.g., *Central of Ga. R. Co. v. Price*, 121 Ga. 651, 655 (1) (49 SE 683) (1905) (in personal injury action against railroad by employee, "it was for the jury to say whether or not the plaintiff, on this occasion, acted with due caution and circumspection"); *Merchants' Nat. Bank of Savannah v. Carhart*, 95 Ga. 394, 398 (2) (22 SE 628) (1894) (in action for negligent retention of bank cashier,

This conclusion is also supported by the fact that, while the pre-1968 Code provisions were in effect, this Court and the Court of Appeals had considered the scope of the involuntary manslaughter statutes and noted that, despite the inclusion of civil or ordinary negligence language, the unlawful manner involuntary manslaughter statute required something more than ordinary civil negligence. See *Geele v. State*, 203 Ga. 369, 373 (47 SE2d 283) (1948) (noting the statutory language in the involuntary manslaughter statutes referring to "due caution and circumspection" and "necessary discretion and caution" and the "culpable neglect" language in Code of 1933 § 26-404, addressing otherwise criminal conduct committed "by misfortune or accident").[21] *Geele* cites a

bank required "to show reasonable care and circumspection" in selecting and retaining employee); *Savannah, Fla. & W. R. Co. v. Slater*, 92 Ga. 391 (1) (17 SE 350) (1893) (headnote by the Court) (in personal injury action, describing negligence of railroad employee in permitting wood to fall from locomotive tender or "casting it from the tender without due caution and circumspection"); *Eason v. Crews*, 88 Ga. App. 602, 615-616 (4) (77 SE2d 245) (1953) (charge of trial court in personal injury action that children not bound "to exercise the discretion and prudence necessary for their safety, with regard to dangerous agencies." (Punctuation omitted.)).

[21] In *Geele*, the appellants, operators of the Winecoff Hotel in Atlanta, were indicted for unlawful manner involuntary manslaughter after the hotel

number of earlier decisions such as *Cain v. State*, 55 Ga. App. 376,

379 (1) (190 SE 371) (1937), in which the Court of Appeals concluded

that "criminal negligence" and "culpable negligence" are

synonymous, and further concluded:

> The degree of negligence to be shown on indictment for manslaughter, where an unintentional killing is established, is something more than is required on the trial of an issue in a civil action. A want of due care, or a failure to observe the rule of a prudent man, which proximately produces an injury, will render one liable for damages in a civil action; but to render one criminally responsible there must be something more, culpable negligence, which under our law is criminal negligence, and is such recklessness or carelessness, resulting in injury or death, as imports a thoughtless disregard of consequences or a heedless indifference to the safety and rights of others and a reasonable foresight that injury would result.

Id. at 379-380 (1). See also *Jordan v. State*, 103 Ga. App. 493, 494

(2) (120 SE2d 30) (1961) (in instructing jury on unlawful manner

involuntary manslaughter, "it is the better practice to charge that it

must result from criminal negligence, which is something more than

---

burned on December 7, 1946. This Court reversed the trial court's decision overruling appellants' demurrers, concluding that the indictment failed to allege any crime. See 203 Ga. at 377.

ordinary negligence which would authorize a recovery in a civil action." (Citations and punctuation omitted.)).

In effect, the 1968 revision reconciled the involuntary manslaughter statutes with the judicial gloss that had been placed upon them by removing the references to ordinary negligence. It also addressed the other concern raised in *Geele* by reconciling the language in the statute defining what constitutes a "crime" with that of the statute addressing misfortune or accident, removing the reference to "culpable neglect" in the latter and substituting "criminal negligence." See Code of 1933 § 26-201 ("Definition of crime or misdemeanor");[22] Ga. L. 1968 at p. 1269, enacting Ga. Code Ann. § 26-601 ("Definition of Crime").[23] Compare Code of 1933 § 26-404 ("Misfortune or accident as affecting liability")[24] with Ga. L.

---

[22] "A crime or misdemeanor shall consist in a violation of a public law, in the commission of which there shall be a union or joint operation of act and intention, or criminal negligence."

[23] "A crime is a violation of statute of this State in which there shall be a union of [sic] joint operation of act, or omission to act, and intention, or criminal negligence."

[24] "A person shall not be found guilty of any crime or misdemeanor committed by misfortune or accident, and where it satisfactorily appears there was no evil design, or intention, or culpable neglect."

1968 at p. 1269, enacting Ga. Code Ann. § 26-602 ("Misfortune or Accident Not a Crime").[25]

But despite these changes to the relevant statutes, and despite the comments of the Criminal Law Study Committee questioning the merits of the distinction,[26] the General Assembly retained the separate unlawful act and unlawful manner provisions in the new involuntary manslaughter statute. Moreover, the legislature retained an unlawful manner involuntary manslaughter statute despite enacting a new misdemeanor offense of "reckless conduct." Presuming that no part of the statutory scheme is without meaning, and that the General Assembly sought "to avoid inconsistencies and overlapping laws," *Patterson*, 299 Ga. at 505 (2) (b) (Blackwell, J.,

---

[25] "A person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking, or intention, or criminal negligence." Ga. Code Ann. § 26-602 was carried forward almost verbatim into the current Code as OCGA § 16-2-2, which provides: "A person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking, intention, or criminal negligence."

[26] See Ga. Code Ann., Committee Notes to Chapter 26-11, Criminal Homicide p. 522 (Harrison Co. 1998) (referring to the distinction between unlawful act and unlawful manner involuntary manslaughter in the past tense and with disapproval); Kurtz, supra, pp. 844-845 n.716 (concluding that the committee notes referred to a change that was proposed but not made).

dissenting), we conclude that the term "unlawful manner," in the involuntary manslaughter statute, requires a mens rea that is more culpable than ordinary or civil negligence, but less culpable than the mens rea required for the crime of "reckless conduct," now codified as OCGA § 16-5-60 (b). And, as discussed below, we also conclude, based upon the body of relevant Georgia law, that the mens rea required for unlawful manner involuntary manslaughter is "criminal negligence."

(d) *Criminal negligence as an element of unlawful manner involuntary manslaughter*.

The term "criminal negligence" was not defined by statute until 2004, when the General Assembly added a definition to the Code section defining a "crime." See Ga. L. 2004, p. 57 (codified as OCGA § 16-2-1).[27] Before that definition was provided, the Georgia courts

---

[27] Subsection (b) of that Code section now provides: "Criminal negligence is an act or failure to act which demonstrates a willful, wanton, or reckless disregard for the safety of others who might reasonably be expected to be injured thereby." Criminal negligence is not in itself a crime, but appears in other definitions in the Criminal Code. See, e.g., OCGA § 16-2-1 (a): "A 'crime' is a violation of a statute of this state in which there is a joint operation of an act or omission to act and intention or criminal negligence"; OCGA § 16-2-2: "A person shall not be found guilty of any crime committed by misfortune or

30

developed interpretations of the term that varied to some extent depending upon the circumstances; for example, if the court was considering whether a defendant's conduct fell within the scope of the "misfortune or accident" statute or whether the conduct fell within one or the other grade of involuntary manslaughter.[28]

Moreover, before 1968 there was no separate crime of "reckless conduct" that courts were required to differentiate from criminal negligence for purposes of unlawful manner involuntary manslaughter, and indeed there was no statutory definition of

accident where it satisfactorily appears there was no criminal scheme or undertaking, intention, or criminal negligence." We hold today that it is likewise an element of unlawful manner involuntary manslaughter.

[28]As LaFave and Scott have observed:

Though the legislatures and the courts have often made it clear that criminal liability generally requires more fault than the ordinary negligence which will do for tort liability, they have not so often made it plain just what is required in addition to tort negligence — greater risk, subjective awareness of the risk, or both. Statutes are sometimes worded in terms of "gross negligence" or "culpable negligence" or "criminal negligence," without any further definition of these terms . . . . The courts thus have had to do their best with little guidance from the legislature, with varying results.

Wayne R. LaFave & Austin W. Scott Jr., Criminal Law § 3.7, at 235-237 (2d ed. 1986), quoted in Black's Law Dictionary, "Criminal negligence" (11th ed. 2019).

"criminal negligence" for some time thereafter. Therefore, when pre-1968 courts analyzed the elements of the offense of unlawful manner involuntary manslaughter, there was no need to carefully distinguish between criminal negligence, the definition of which now includes the word "reckless," and the mens rea now required for statutory "reckless conduct," which may not be precisely what we have referred to as "recklessness" in older cases.[29] See, e.g., *Cain*, 55 Ga. App. at 379-380 (1). For example, in *Austin v. State*, 110 Ga. 748 (36 SE 52) (1900), cited with approval in *Geele*, this Court noted that

> [w]here death results to one from the discharge of a gun in the hands of another, and there was no intention to kill nor an intention to discharge the gun, the person in whose hands the gun was held would not be guilty of murder, although the gun *may have been handled in a careless and negligent, even reckless manner*. In such a case the slayer would be guilty of involuntary manslaughter only, and the particular grade of that crime would depend upon whether it was lawful or unlawful for the slayer to be in possession of a deadly weapon at the time and place of the killing.

---

[29] As we noted in *Dunagan v. State*, 269 Ga. 590, 593 (2) (a) n.3 (502 SE2d 726) (1998), the language of pre-1968 cases must be considered with "[g]reat caution and care," because the 1968 Criminal Code made significant changes in the law of homicide, as noted above.

(Emphasis supplied.) Id. at 750.[30] And although *Geele* stated that

*Austin* "defined negligence, carelessness, and recklessness under the

involuntary-manslaughter statute to mean the same thing," 203 Ga.

at 375, and that recklessness was required to show either grade of

involuntary manslaughter, the Court in *Austin* seemed to indicate,

by use of the qualifying term "even," that recklessness was more

culpable than either ordinary negligence or carelessness, even

before the enactment of the statutory offense of reckless conduct.

See 110 Ga. at 750.[31]

Other decisions of Georgia courts have not included the concept

---

[30] In *Austin*, the State introduced evidence of a deliberate shooting, but the evidence for the defense tended to show that a group of friends was engaging in horseplay and that the victim was fatally shot while playfully attempting to take a firearm away from the appellant. The Court reversed the appellant's murder conviction based on the trial court's erroneous charge on murder and unlawful manner involuntary manslaughter, concluding that if the jury believed the appellant's evidence, he "was either not guilty of any offense, or, at most, guilty of the lowest grade of manslaughter [that is, unlawful manner involuntary manslaughter]. If the testimony in behalf of the State was true, the accused was guilty of willful and deliberate murder." 110 Ga. at 750.

[31] Moreover, these conclusions in *Geele* were at best dicta, since this Court went on to hold that the indictment failed to allege any criminal offense, including unlawful manner involuntary manslaughter, and reversed the overruling of the appellants' demurrers. See 203 Ga. at 376-377.

of recklessness in their analysis of unlawful manner involuntary manslaughter. For example, in *Drake v. State*, 221 Ga. 347 (144 SE2d 519) (1965), the appellant shot and killed the victim in the woods of north Georgia. The appellant told the investigating officers that he was deer hunting but shot at what he thought was a fox in the mist or fog. While the State's evidence was sufficient to support the appellant's conviction of murder, it also could have supported a finding that the appellant killed the victim without any intention of doing so in the commission of an unlawful act — hunting deer out of season — or "while shooting at a fox, a lawful act, without due caution and circumspection, resulting in culpable negligence." Id. at 348 (2).[32] This Court held that the trial court erred in failing to instruct the jury on both grades of involuntary manslaughter. See id.

In *Flannigan v. State*, 136 Ga. 132 (70 SE 1107) (1911), a young

---

[32] As noted above, "culpable neglect," part of the definition of "misfortune or accident" in Code of 1933 § 26-404, was replaced in 1968 by the term "criminal negligence" in Ga. Code Ann. § 26-601, now OCGA § 16-2-1, see Ga. L. 1968 at p. 1269, but the latter term was not statutorily defined until 2004.

man was fatally stabbed. The appellant was convicted of murder and appealed the denial of his request for an instruction on unlawful manner involuntary manslaughter. While the State offered evidence tending to prove murder, the appellant's evidence would have allowed the jury to find that he and two friends were playfully wrestling over the appellant's knife when the victim was inadvertently stabbed in the leg. This Court concluded that the trial court should have instructed the jury on unlawful manner involuntary manslaughter:

> If the circumstances attending the commission of a homicide by stabbing or cutting with a knife authorize the inference that there was no wrongful act, and no intention to stab or cut, but that the wound was inflicted because the person lawfully in possession of the knife may not have exercised necessary and proper precaution against a probable serious injury to the person who is engaged in a playful struggle to dispossess him of the knife, the homicide would be involuntary manslaughter. The accused under such circumstances would not be entirely exonerated from the consequences of his unintentional act, where he fails to observe proper precaution against the infliction of serious injury, or where the injury would not have been inflicted but for his negligence.

Id. at 133. And in *Burton v. State*, 92 Ga. 449 (17 SE 99) (1893), the

35

concept of recklessness was specifically excluded:

> [W]here both the evidence and the prisoner's statement indicate that the shooting which produced the homicide may have been accidental, and that the fatal result may have been due to handling the pistol, *not recklessly*, but without the observance of proper caution and circumspection, the offence committed, if any, was not necessarily murder, but may have been involuntary manslaughter in the commission of a lawful act.

(Emphasis supplied.) Id. at 449. As noted in those decisions, unlawful manner involuntary manslaughter gives the finder of fact the option to find a level of culpability between complete exoneration by reason of misfortune or accident and involuntary manslaughter in the commission of an unlawful act.

In defining the upper limit of that lower level of culpability for purposes of unlawful manner involuntary manslaughter, the term "reckless" has been somewhat elastic and has had different meanings in different contexts.[33] In Georgia, it has been used in the

---

[33] The ordinary dictionary definition of "reckless" is expansive: "1a: lacking in caution: deliberately courting danger: foolhardy, rash . . . b: careless, neglectful, thoughtless . . . 2a: marked by a lack of caution: heedless, rash . . . b: marked by a lack of foresight or consideration: improvident, negligent . . . c: irresponsible, wild." Webster's Third New International Dictionary 1896

analysis of intent for purposes of malice murder,[34] the statutory definition of "criminal negligence," and as part of the definition of "gross negligence" in the civil context.[35] But, somewhat curiously, the word "reckless" itself is not included in the statutory definition of the offense denominated as "reckless conduct," but instead appears in the definition of "criminal negligence."

We accordingly must look at the specific wording of the statutes to differentiate unlawful manner involuntary manslaughter from the misdemeanor offense of "reckless conduct." Under OCGA § 16-5-60 (b), to commit the offense of "reckless conduct," a person must "consciously disregard[ ] a substantial and unjustifiable risk that his

---

(1976).

[34] See *Downey v. State*, 298 Ga. 568, 569-570 (1) (783 SE2d 622) (2016) (firing shots "in conscious disregard of the substantial risk of harm to which the shots exposed others" constitutes "recklessness sufficient to imply malice" for purposes of malice murder).

[35] See *McKinney v. Burke*, 108 Ga. App. 501, 507 (4) (133 SE2d 383) (1963) ("[A]n inadvertent act accompanied by recklessness is said to be something more than ordinary negligence, and to amount at the least to gross negligence."). See also *Wheat v. State*, 171 Ga. App. 583, 584 (2) (320 SE2d 808) (1984) (second-degree vehicular homicide by violation of State Department of Transportation rules for oversize loads; indictment "based on appellant's gross negligence by operating an oversized vehicle without providing a front escort vehicle for the mobile home, in reckless and careless disregard for the safety of the traveling public").

act or omission will cause harm or endanger the safety of [another] person," in "gross deviation" from the standard of care which a reasonable person would exercise in the situation. On the other hand, OCGA § 16-2-1 defines "criminal negligence" as "an act or failure to act which demonstrates a willful, wanton, or reckless disregard for the safety of others who might reasonably be expected to be injured thereby." The distinction between the two is found in the statutory requirements in OCGA § 16-5-60 (b) that the person "consciously disregard[ ] a substantial and unjustifiable risk" that is a "gross deviation" from a reasonable standard of care. See *Henderson v. Hames*, 287 Ga. 534, 538-539 (3) (697 SE2d 798) (2010) (construing virtually identical language in OCGA § 16-11-108, misuse of a firearm while hunting, as prescribing the mens rea of the offense, and holding Hames' convictions void for failure of the indictment to allege that the defendant "consciously disregard[ed] a substantial and unjustifiable risk that his act or omission will cause harm to or endanger the safety of another person" although the indictment did allege a gross deviation from the standard of care).

38

The Court of Appeals has also applied this analysis in cases involving a shooting death. In *Nutt v. State*, 159 Ga. App. 46 (282 SE2d 696) (1981), the appellant contended that he was examining a pistol that the victim was offering for sale when he cocked it and then attempted to lower the hammer, and the pistol discharged. The appellant claimed an accidental shooting but was convicted of unlawful act involuntary manslaughter, and enumerated as error the trial court's refusal to charge on unlawful manner involuntary manslaughter. The Court of Appeals in its analysis contrasted criminal (formerly "culpable") negligence with the statutory offense of reckless conduct:

> Our view of the evidence is that the victim's death resulted from (1) accidental discharge of the pistol, if appellant's testimony were to be believed, or (2) in the commission of an unlawful act, either pointing the pistol at the victim (Code Ann. § 26-2908) [now OCGA § 16-11-102] or while consciously disregarding a substantial and unjustifiable risk (Code Ann. § 26-2910) [now OCGA § 16-5-60 (b)], or (3) handling the pistol, a lawful act, without due caution and circumspection resulting in culpable negligence.

Id. at 47 (1).[36] The Court of Appeals reversed the appellant's conviction due to the trial court's failure to instruct the jury on unlawful manner involuntary manslaughter under the last alternative. See id.; see also *Chambers v. State*, 205 Ga. App. 16, 19 (421 SE2d 88) (1992) (criminal negligence may be distinguished from the statutory offense of reckless conduct because the latter requires that the appellant act while consciously disregarding "a substantial and unjustifiable risk" of harm in "gross deviation from the standard of care which a reasonable person would exercise in the situation").[37]

---

[36] Because one judge on the panel concurred in the judgment only, *Nutt* is "physical precedent only." See Court of Appeals Rule 33.2 (a) (2). However, the reasoning of *Nutt* was relied upon by the Court of Appeals in *Chambers v. State*, 205 Ga. App. 16, 19 (421 SE2d 88) (1992), in which all members of the panel concurred. Moreover, while the Court of Appeals in *Nutt* omitted the second part of the mens rea required for statutory "reckless conduct" (that the disregard was a gross deviation from a reasonable standard of care), *Chambers* correctly states the language of the Code section.

[37] In *Chambers*, as in *Nutt*, the appellant contended that he attempted to lower the hammer on a loaded and cocked revolver to render the gun safe, but the gun accidentally discharged. See 205 Ga. App. at 17. The Court of Appeals rejected the appellant's contention that he was entitled to a charge on unlawful act involuntary manslaughter based upon statutory reckless conduct, because "appellant's statements indicate that he acted consciously to *avoid* the substantial risk of harm to himself" and the victim, "but that the manner in which he handled the revolver he received from [the victim] was without due

This distinction explains those decisions which on first glance appear to conflate criminal negligence with statutory "reckless conduct," such as *State v. Springer*, 297 Ga. 376 (774 SE2d 106) (2015), in which this Court stated: "Reckless conduct, in contrast [to aggravated assault], is an act of criminal negligence, rather than an intentional act, that causes bodily harm or endangers the bodily safety of another." (Citations and punctuation omitted.) Id. at 379 (1). The issue in *Springer*, however, was not the necessary elements of statutory "reckless conduct," but whether convictions for aggravated assault and reckless conduct arising out of a shootout in a public parking lot were mutually exclusive; this Court concluded that they were not. See id. at 382 (1).[38]

Similarly, in *Dunagan v. State*, 269 Ga. 590 (502 SE2d 726)

---

caution and circumspection, resulting in culpable negligence." (Citation and punctuation omitted; emphasis in original.) 205 Ga. App. at 19. The court further concluded that the appellant would have been entitled to a charge on unlawful manner involuntary manslaughter under OCGA § 16-5-3 (b), but that he expressly disavowed requesting that instruction, and the failure to give it was not harmful as a matter of law. See 205 Ga. App. at 20; see also OCGA § 5-5-24 (c).

[38] Elsewhere in the opinion, *Springer* noted all the necessary elements of the statutory offense of reckless conduct. See 297 Ga. at 383 (3).

(1998), the Court did not address the elements of the statutory offense of reckless conduct in concluding that "criminal intent and criminal negligence are not interchangeable in those instances where the mental culpability of the actor is the essential element that distinguishes two separate crimes," such as the offense of aggravated assault. Id. at 592 (2) (a). *Dunagan* relied in part upon *Lindsey v. State*, 262 Ga. 665 (424 SE2d 616) (1993), in which the Court observed that "[r]eckless conduct is an act of criminal negligence, rather than an intentional act," (citation omitted), id. at 666 (2) (b), but in the context of determining that the appellant was not entitled to instructions on accident or involuntary manslaughter when he admitted that he deliberately fired his gun at the victims' car and asserted the defense of justification by self-defense.[39] As *Hames*, 287 Ga. at 538 (3), clearly holds in interpreting the almost identical language of OCGA § 16-11-108 (a), "consciously

---

[39] This is consistent with our decisions noting that a defendant who asserts justification by self-defense is not entitled to an additional instruction on involuntary manslaughter on the theory that he used excessive force in defending himself. See footnote 47 below.

disregarding a substantial and unjustifiable risk" and "gross deviation" from a reasonable standard of care are requirements of the reckless conduct statute and together constitute the mens rea necessary to establish that crime, and our decisions in *Springer*, *Dunagan*, and *Lindsey* do not contradict that.

Accordingly, we conclude that the General Assembly, in enacting the reckless conduct statute while retaining both grades of involuntary manslaughter, meant to preserve a distinction between criminal negligence as the mens rea element of the offense of unlawful manner involuntary manslaughter and the statutory offense of "reckless conduct," and that it reaffirmed that decision in 2004 by providing a statutory definition of "criminal negligence."

(e) *What constitutes a "lawful act" under OCGA § 16-5-3 (b).*

"A 'crime' is a violation of a statute of this state in which there is a joint operation of an act or omission to act and intention or criminal negligence." OCGA § 16-2-1 (a). Conversely, a lawful act is something that is not a crime within the meaning of the laws of this state. Whether a defendant is entitled to a jury instruction on a

43

lawful act committed in an unlawful manner under OCGA § 16-5-3 (b) depends upon the evidence presented at trial with respect to the defendant's actions. If the evidence at trial shows without dispute that the fatal act was unlawful, the defendant is not entitled to such an instruction. And if the evidence shows without dispute that the fatal act constituted no crime at all (due to, for example, accident or self-defense), the defendant is likewise not entitled to an instruction on unlawful manner involuntary manslaughter. But if the evidence is in conflict as to whether the fatal act was unlawful or merely rose to the level of criminal negligence, the defendant is entitled, at least when he so requests, to have the jury instructed on the commission of a lawful act in an unlawful manner under OCGA § 16-5-3 (b).

A review of selected cases on involuntary manslaughter provides some guidance for determining whether there is slight evidence of the commission of a lawful act in an unlawful manner to support an instruction on OCGA § 16-5-3 (b). For example, if the uncontradicted evidence shows that the defendant was not in lawful possession of the weapon that caused the victim's death at the time

the fatal injury was inflicted, no instruction on unlawful manner involuntary manslaughter is required. See *Austin*, 110 Ga. at 750 ("the particular grade" of involuntary manslaughter involved in that case — that is, unlawful act or unlawful manner — "would depend upon whether it was lawful or unlawful for the slayer to be in possession of a deadly weapon at the time and place of the killing"); *Flannigan*, 136 Ga. at 133 (lawful act for purpose of unlawful manner involuntary manslaughter statute requires, at a minimum, that "the person [be] lawfully in possession of" the fatal weapon).[40] See also *Snell v. State*, 306 Ga. App. 651, 654 (3) (703 SE2d 93) (2010) (using reasoning consistent with this Court's analysis in *Austin* and *Flannigan* to reject appellant's contention that he was entitled to an instruction on unlawful manner involuntary

---

[40] In *Flannigan*, the appellant's employer testified that the knife used to inflict the fatal injury belonged to the employer and was kept at his place of business, but that the appellant was "a trusted servant and occasionally carried the knife off with him." 136 Ga. at 134. An instruction on unlawful manner involuntary manslaughter was required because some evidence at trial suggested that the appellant was merely engaging in "prankish sport" by wrestling with the victim over the knife, without being "sufficiently circumspect in guarding against the probable consequences of playing with a dangerous weapon." Id.

manslaughter, because even under his own version of the events, Snell conceded that his possession of a concealed weapon in the victim's home at the time of the fatal shooting was a violation of the version of OCGA § 16-11-126 then in effect).[41]

Another question in determining whether an instruction on unlawful manner involuntary manslaughter is warranted is whether there is slight evidence that the defendant's handling of the weapon at the time the fatal injury to the victim was inflicted amounted to at least (and not necessarily more than) criminal negligence, in light of all the surrounding circumstances. Such evidence may include a showing of a deliberate but lawful act done in an unlawful (criminally negligent) manner, such as intentionally discharging a firearm with the professed intent of shooting a fox but without verifying his target in poor visibility, as in *Drake*, 221 Ga.

---

[41] Snell was indicted for murder, felony murder, and aggravated assault, but convicted of unlawful act involuntary manslaughter as a lesser included offense of felony murder. See *Snell*, 306 Ga. App. at 651. The State's witnesses testified that Snell deliberately shot the victim at point-blank range, while Snell contended that the shooting occurred when he accidentally dropped his pistol from his coat and attempted to grab it, causing it to discharge. See id. at 652 (1).

at 348 (2), or a box located too close to a person, as in *Teasley v. State*, 228 Ga. 107 (184 SE2d 179) (1971), with fatal consequences not intended by the shooter. Such evidence also may include a showing that the defendant had no intention of discharging a firearm, but an inadvertent and fatal discharge occurred while the defendant was lawfully handling the firearm but in an unlawful, criminally negligent manner, as in *Austin*, 110 Ga. at 750, or *Maloof v. State*, 139 Ga. App. 787 (229 SE2d 560) (1976).

Thus, determining whether there is slight evidence of the commission of a "lawful act" in an "unlawful manner" within the meaning of OCGA § 16-5-3 (b), to support a jury instruction on unlawful manner involuntary manslaughter, requires consideration of all the evidence of the defendant's intent based on, among other things, the circumstances surrounding the fatal act in question. The cases make clear that, in considering whether an instruction on OCGA § 16-5-3 (b) is appropriate, the trial court must consider only whether slight evidence supports the charge, and the ultimate determination of whether the defendant acted lawfully but with

criminal negligence is for the jury under proper instruction.

(f) *Application in firearm cases.*

As the foregoing discussion demonstrates, here the trial court erred when it ruled as a matter of law that a jury should *never* be instructed on unlawful manner involuntary manslaughter in a shooting death case. In its order denying McIver's motion for new trial, the trial court cited *Manzano* in support of its refusal to give the requested charge. While the trial court did not quote the language it relied upon, that decision states broadly that

> "[a] defendant who handles a gun in such a way as to accidentally cause the death of another human being, albeit without any intention to do so, has necessarily committed the misdemeanor of reckless conduct. . . . [Cit.]" *Cook v. State*, 249 Ga. 709, 712 (4) (292 SE2d 844) (1982). See also *Reed v. State*, 279 Ga. 81, 85 (7) (610 SE2d 35) (2005).

*Manzano*, 282 Ga. at 559 (3) (a). The same language is relied upon in *Cook* and *Reed*, and appears to have originated in an expansive interpretation of language used in *Raines v. State*, 247 Ga. 504, 507 (3) (277 SE2d 47) (1981). But in each of those cases, the uncontradicted evidence as outlined in the opinion showed that the

48

appellant committed an unlawful act that caused the death of the victim, thus taking his conduct outside the scope of unlawful manner involuntary manslaughter.

In *Manzano*, unlawful manner involuntary manslaughter was not even addressed. Manzano testified that he intentionally pressed his pistol to his wife's head and pulled the trigger, but that he and his wife were only engaging in "horseplay" because both mistakenly believed that the pistol was unloaded. See 282 Ga. at 557. Convicted of felony murder, Manzano appealed, asserting that the trial court should have given his requested instructions on *unlawful act* involuntary manslaughter with the alternative predicate misdemeanor offenses of pointing a pistol at another and reckless conduct. This Court agreed and reversed with respect to the predicate act of pointing a pistol at another, see id. at 558-559 (2), also noting that the trial court erred in refusing to instruct on unlawful act involuntary manslaughter with reckless conduct as the predicate offense. See id. at 559 (3) (a).

Similarly, the cases cited in *Manzano* involved conduct in

handling a firearm amounting at least to the statutory offense of reckless conduct. For example, in *Reed*, the appellant shot his girlfriend in the head, killing her, while he was driving a car and she was riding in the front passenger seat. Reed's defense at trial was accident, and the jury was charged on that issue. Convicted of murder, Reed appealed, asserting that he was entitled to a charge on unlawful manner involuntary manslaughter. However, the evidence as recited in the opinion showed that "Reed's admitted conduct was not a lawful act." 279 Ga. at 86 (7). He intentionally produced and displayed a loaded firearm with his finger on the trigger in close proximity to the victim, and his attention was diverted from the location of the muzzle because he was "watching the road trying to drive." Id. Moreover, the State presented uncontradicted testimony that the gun's trigger was pulled twice. See id. at 82.

*Reed*, like *Manzano*, quotes the language in *Cook* that "a defendant who handles a gun in such a way as to accidentally cause the death of another human being . . . has necessarily committed the

misdemeanor of reckless conduct," 249 Ga. at 712 (4). But in *Cook*, even according to Cook's testimony at trial, he retrieved a pistol during an argument with the victim, the mother of his child; he turned toward her; and "the gun accidentally went off," striking the victim in the forehead. 249 Ga. at 710. The opinion notes no contradiction to the medical examiner's testimony that "the gun was no more than several inches away from the victim's head when the fatal shot was fired." Id. Cook's deliberately bringing a loaded gun into close proximity to the victim's head during an argument constituted conscious disregard of a substantial and unjustifiable risk that he would cause harm or endanger the safety of the victim, and the disregard constituted a gross deviation from a reasonable standard of care, establishing the statutory offense of reckless conduct, and thus was not a lawful act. See id. at 712 (4). See also *McDonald v. State*, 224 Ga. App. 411, 413 (481 SE2d 1) (1997) (the defendant's deliberately grabbing his wife by the arm during an argument and firing a revolver next to her head was sufficient to support his conviction for reckless conduct under OCGA § 16-5-60

(b)).

In *Cook*, this Court cited two cases in support of its statement: *Raines* and *Ranger v. State*, 249 Ga. 315, 320 (4) (290 SE2d 63) (1982).[42] In *Raines*, the appellant was convicted of murder after he shot his wife three times with a revolver during a domestic quarrel, killing her.[43] Raines, a double amputee paralyzed from the waist down, maintained that the revolver inadvertently discharged when he lost his balance because he was not wearing his prosthetic device. See 247 Ga. at 505.[44] The Court rejected Raines' contention that the

---

[42] In *Ranger*, the appellant was convicted of murder of his pregnant girlfriend and her child, who was born alive but died shortly afterward. The defense called no witnesses, and there was no evidence of how the shooting occurred. Ranger asserted as error the trial court's refusal to charge on unlawful manner involuntary manslaughter, and in its brief treatment of this enumeration of error, this Court simply observed, "There is no evidence here that Helena Carter's death, or her child's, was caused by commission of a lawful act in an unlawful manner," and cited *Raines*. *Ranger*, 249 Ga. at 320 (4).

[43] The *Raines* court was sharply divided, with Chief Justice Jordan, Presiding Justice Hill, and Justice Marshall dissenting as to the reversal on the voluntary manslaughter charge in Division 1, while Justices Undercofler and Smith dissented as to Divisions 2 and 3. The opinion was issued per curiam.

[44] Raines' doctor, asked what Raines' balance would be like without the prosthesis, testified, "Well, categorically it would be awkward to say the least." 247 Ga. at 504 n.1.

trial court should have instructed the jury on both unlawful act and unlawful manner involuntary manslaughter. See id. at 507 (3).[45] With respect to unlawful act involuntary manslaughter, Raines claimed that he did not intend to shoot his wife and that the jury could have found that he did so while committing the misdemeanor of pointing a pistol at another. The Court rejected Raines' contention with respect to unlawful act involuntary manslaughter, concluding that the evidence showed that, even if Raines' wife had not died, Raines committed aggravated battery, a felony, by shooting and wounding his wife three times, id. at 507 (3), and pointing out that, in the case relied upon by Raines, only a single shot was fired. See id. at 507 (2) n.4.[46]

With respect to unlawful manner involuntary manslaughter,

---

[45] The Court reversed, however, based upon the trial court's failure to instruct the jury on voluntary manslaughter by reason of "serious provocation" under former Ga. Code Ann. § 26-1102, now OCGA § 16-5-2, due to the victim's taunting of Raines with her adultery and his disability. See 247 Ga. at 506 (1). But because of the possibility of the issue arising on retrial, we also considered Raines' contentions with regard to instructions on both grades of involuntary manslaughter.

[46] Despite the physical evidence of his wife's wounds and three discharged shells found at the scene, Raines maintained that the gun only "fired twice." 247 Ga. at 505.

Raines contended that his "lawful act" occurred earlier in the evening, when, he testified, he retrieved his revolver from under a mattress and "walked on his hands" to the back door because he "thought he heard a noise outside." *Raines*, 247 Ga. at 504. Thereafter, he found a letter from his wife's boyfriend in her purse, returned to the bedroom and confronted her about the letter, and she began to taunt him with his disability and her infidelities. It was during the course of this subsequent quarrel, he claimed, that he lost his balance while attempting to lie down on the bed, fell down, and the gun "went off." Id. at 505. The Court concluded that the evidence, including Raines' own testimony and argument, showed that he was not engaged in a lawful act at the time of the shooting. Holding a loaded gun while involved in an argument and attempting to move around, knowing that one is both paralyzed from the waist down and dependent upon a prosthesis for balance, can be fairly characterized as a conscious disregard of a substantial and unjustifiable risk of harm to another that constitutes a gross deviation from a reasonable standard of care, thereby fulfilling all

54

the elements of the statutory offense of reckless conduct, then Ga. Code Ann. § 26-2910. See id. at 507 (3) and n.5.

The State also relies upon *Ward v. State*, 252 Ga. 85 (311 SE2d 449) (1984). There, the victim was told to come to Ward's trailer regarding a debt he owed to Ward. Ward testified that the victim offered drugs in partial payment of the debt, but the owner of those drugs, Whitlock, objected and put his hand in his back pocket. See id. at 87. Ward retrieved a rifle, cocked it, and told Whitlock to take his hand out of his pocket and leave; at that point, the victim "started up from the bed," Ward "jumped backwards" and hit a piece of furniture, and "the gun went off." Id. The jury was instructed on accident and justification by self-defense. The Court rejected Ward's contention that the trial court erred in refusing his request to charge on unlawful manner involuntary manslaughter, noting that Ward's conduct in handling the rifle "consciously disregard[ed] a substantial and unjustifiable risk that the act [would] cause harm or endanger the safety of another" and constituted the offense of reckless conduct, citing OCGA § 16-5-60 (now OCGA § 16-5-60 (b))

and *Raines*. *Ward*, 252 Ga. at 88 (1).[47]

A close reading of these decisions shows that the expansive language used in *Cook*, *Reed*, and *Manzano*, derived from but not quoting the decision in *Raines*, fails to take into account the context in which it originated and was applied. In *Cook*, *Reed*, and *Manzano*, the undisputed evidence established that the appellant acted with conscious disregard of a substantial and unjustifiable risk of harm, constituting a gross deviation from a reasonable standard of care — the elements of statutory reckless conduct under OCGA § 16-5-60

---

[47] In *Ward*, we failed to mention the other component of the mens rea required for statutory reckless conduct, namely, gross deviation from a reasonable standard of care. *Ward* also relies upon *Crawford v. State*, 245 Ga. 89 (263 SE2d 131) (1980), and *Saylors v. State*, 251 Ga. 735 (309 SE2d 796) (1983). The latter two decisions are inapplicable to the case before us, because they hold that a defendant asserting justification by self-defense is not entitled to an additional instruction on involuntary manslaughter under either subsection of OCGA § 16-5-3 on the theory that the defendant used excessive force in self-defense. See *Crawford*, 245 Ga. at 92 (3); *Saylors*, 251 Ga. at 737 (3); see also *Harris v. State*, 272 Ga. 455, 456-457 (3) (532 SE2d 76) (2000) ("Because appellant conceded that he shot at the victims intentionally, albeit in self-defense, a charge on the lesser offense of involuntary manslaughter, which requires a lack of intent, was not warranted."). In *Raines*, the Court noted that *Crawford* is not controlling when a defendant claims accident and not self-defense. *Raines*, 247 Ga. at 506 (2). See also *Chambers*, 205 Ga. App. at 19 (noting that *Willis v. State*, 258 Ga. 477, 477-478 (1) (371 SE2d 376) (1988), citing *Saylors* and *Crawford*, "does not hold that OCGA § 16-5-3 (b) is inapplicable any time the victim is killed by the shooting of a gun").

(b). An unlawful manner involuntary manslaughter charge was not requested in *Manzano*, and in *Cook* and *Reed* this Court concluded that the trial court correctly refused a charge on OCGA § 16-5-3 (b) because slight evidence did not support such a charge. But none of these decisions supports the proposition that *any* handling of a firearm resulting in an unintended death *always* constitutes at least the statutory offense of reckless conduct and therefore forecloses an instruction on unlawful manner involuntary manslaughter.

We accordingly disapprove the statement in *Cook*, *Reed*, and *Manzano* that "[a] defendant who handles a gun in such a way as to accidentally cause the death of another human being, albeit without any intention to do so, has necessarily committed the misdemeanor of reckless conduct," to the extent it suggests that an instruction on unlawful manner involuntary manslaughter is *never* appropriate in a case involving a fatal shooting.[48] Under the specific circumstances outlined in those decisions, a jury instruction on unlawful manner

---

[48] We disapprove only this statement, and express no opinion regarding whether these cases were correctly decided.

involuntary manslaughter was not appropriate. But when there is slight evidence, even if in dispute, that the defendant caused the death of another person in the commission of a lawful act but in a merely criminally negligent manner, a charge on unlawful manner involuntary manslaughter is supported.

The Court of Appeals reached a similar conclusion in *Allison v. State*, 288 Ga. App. 482, 484-485 (1) (654 SE2d 628) (2007), an appeal of a conviction for reckless conduct under OCGA § 16-5-60 (b). The appellant went to a friend's apartment to retrieve a bag of clothing. He had a pistol in the bag, and was checking the gun, which was pointed down, when it went off. The bullet traveled through a wall into an adjacent apartment, where it ricocheted off the floor and a metal door before striking a child in the head, causing serious injury. There was no evidence that the appellant knew the gun was loaded, or that he intentionally fired it. See id. at 482 (1). The Court of Appeals reversed the conviction, concluding that the evidence was insufficient because it did not establish that the appellant handled the firearm in a manner creating "a 'substantial and unjustifiable

risk' that he would endanger the safety of another person." Id. at 483 (1) (quoting OCGA § 16-5-60 (b)). In so deciding, the Court of Appeals concluded that the language in *Manzano*, *Reed*, and *Cook* was not intended to "transform the crime of reckless conduct into a strict liability crime" whenever a firearm is involved, and that "[t]he words 'in such a way' should not be interpreted to mean any and all types of gun handling; instead, they should be interpreted to track" the mens rea language in OCGA § 16-5-60 (b). *Allison*, 288 Ga. App. at 484-485. We agree that such a construction is necessary in order to avoid rendering OCGA § 16-5-3 (b) meaningless in every case involving a shooting death.

This interpretation of *Raines* and its progeny is also consistent with the principle that a charge on involuntary manslaughter — including unlawful act involuntary manslaughter under OCGA § 16-5-3 (a) — is not authorized when the undisputed evidence demonstrates that the defendant acted intentionally in harming the victim. See, e.g., *Cheeves v. State*, 306 Ga. 446, 447-448 (2) (831 SE2d 829) (2019) (instruction on unlawful act involuntary manslaughter

not required when appellant pointed gun directly at victim and shot victim multiple times); *Harris v. State*, 257 Ga. 385, 386 (1) (359 SE2d 675) (1987) (trial court properly refused to charge on unlawful act involuntary manslaughter when appellant repeatedly stabbed victim and threatened him); *Conner v. State*, 251 Ga. 113, 116 (2) (c) (303 SE2d 266) (1983) (appellant not entitled to instruction on unlawful act involuntary manslaughter when victim was beaten severely and "the number of wounds inflicted leaves no doubt on the question of intent or voluntariness" (Citation and punctuation omitted)).[49]

Once these decisions are removed from consideration, however,

---

[49] We also disapprove the bench note accompanying the Georgia pattern jury instruction on involuntary manslaughter to the extent it suggests that "'a lawful act committed in an unlawful manner' is often going to be equivalent to reckless conduct (see [OCGA] § 16-5-60 (b)), a misdemeanor which would support the charge of felony involuntary manslaughter," citing *Kellam v. State*, 298 Ga. 520, 523 (2) (783 SE2d 117) (2016), and *Harmon v. State*, 259 Ga. 846, 848 (4) (b) (388 SE2d 689) (1990). Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases § 2.10.45 (4th ed. 2007, rev. 2021) (Involuntary Manslaughter (Misdemeanor)). In the two cases cited by the bench note, this Court held that the severe injuries to the victims could not have resulted from any lawful act. And, as discussed above, statutory reckless conduct is an "unlawful act" and thus *never* equivalent to a "lawful act committed in an unlawful manner."

a group of cases remains in which the evidence, even if slight, would allow a jury to find unlawful manner involuntary manslaughter because the act resulting in the victim's death was not intentional or unlawful in itself, and the defendant under the circumstances acted only in a criminally negligent manner rather than in violation of all the elements of the reckless conduct statute. And in such cases, an instruction on OCGA § 16-5-3 (b) is appropriate.

For example, in *Teasley*, during a chaotic Christmas Eve encounter between Teasley, his wife, his girlfriend, and the police, the girlfriend was struck and killed by a bullet fired from Teasley's pistol. See 228 Ga. at 109. At some point, Teasley shot at the lock of a metal box, located a few feet away from where the victim was lying on the floor, in an apparent attempt to access its contents. See id. A pathologist's testimony did not exclude the possibility that the fatal bullet ricocheted from the metal box, although he considered it unlikely. See id.

Teasley was convicted of malice murder and appealed, complaining of error in the refusal of several of his requests to

charge. We reversed, concluding that the trial court erred in failing to give several jury instructions, including on unlawful manner involuntary manslaughter, observing that while the evidence was sufficient to support the jury's verdict of murder, it was also sufficient to raise a jury issue as to unlawful manner involuntary manslaughter:

> From the circumstances of the homicide as referred to above, the evidence was ample to raise an issue for the jury's consideration as to the defense of [involuntary] manslaughter. It was sufficient to authorize the jury to consider whether the victim's death was a result of the appellant's lawfully firing the pistol in an unlawful manner, in close proximity to the victim so as to cause the bullet to richochet [sic] and strike her.

*Teasley*, 228 Ga. at 111 (4).[50] The evidence also appears to have been sufficient for the jury to have found that the appellant's act of intentionally firing a loaded pistol at a box only a few feet away from the victim amounted to statutory reckless conduct and thus the offense of unlawful act involuntary manslaughter under OCGA § 16-

---

[50] This Court also concluded that the evidence authorized an instruction on misfortune or accident under former Ga. Code Ann. § 26-602, now OCGA § 16-2-2, see 228 Ga. at 110 (3), as well as two requested instructions with respect to the defense of insanity. See id. at 111-112 (5).

5-3 (a), but it does not appear from the opinion that Teasley requested an instruction on unlawful act involuntary manslaughter or enumerated as error the refusal to give such an instruction.

Similarly, in *Maloof*, the appellant was indicted for murder but convicted of unlawful act involuntary manslaughter in the shooting death of his wife. See 139 Ga. App. at 787 (syllabus by the Court). At trial, he testified that, during a domestic quarrel, he was attempting to lower the hammer of a handgun after he noticed it was cocked. While he did so, he pointed the gun upward, "towards the crease in the wall and ceiling," and while he was not looking at his wife she "tried to get past him" and the handgun discharged, killing her. Relying on *Teasley*, the Court of Appeals reversed, concluding that the trial court erred in failing to instruct the jury on unlawful manner involuntary manslaughter because the evidence authorized the jury to consider whether the appellant was lawfully using the pistol, but "in an unlawful manner, in close proximity to

the victim." (Citation and punctuation omitted.) Id. at 788.[51]

The trial court therefore erred in relying upon *Manzano* to conclude that unlawful manner involuntary manslaughter is never applicable in a shooting death case and in refusing McIver's requested instruction on unlawful manner involuntary manslaughter on that basis.

(g) *Evidence supporting the requested charge.*

We must next consider whether slight evidence supported McIver's request to instruct the jury on unlawful manner involuntary manslaughter.

> To authorize a requested jury instruction, there need only be slight evidence to support the theory of the charge, and the necessary evidence may be presented by the State, the defendant, or both. Whether the evidence presented is sufficient to authorize the giving of a charge is a question of law.

(Citations and punctuation omitted.) *Merritt v. State*, 311 Ga. 875, 889 (7) (860 SE2d 455) (2021). "The evidence necessary to justify a

---

[51] On retrial, the appellant was convicted of unlawful manner involuntary manslaughter, and that conviction was affirmed by the Court of Appeals in *Maloof v. State*, 145 Ga. App. 408 (243 SE2d 634) (1978).

jury charge need only be enough to enable the trier of fact to carry on a legitimate process of reasoning." (Citations and punctuation omitted.) *Calmer v. State*, 309 Ga. 368, 370 (2) (846 SE2d 40) (2020). And "[i]n determining whether a trial court erred in giving jury instructions, we read and consider the instructions as a whole." *Stafford v. State*, 312 Ga. 811, 820 (4) (865 SE2d 116) (2021).

Here, the evidence presented at trial provided some support for the requested instruction. Evidence was presented that, at the time of the shooting, McIver was asleep in the back seat of a moving car with the loaded revolver on his lap in a plastic grocery bag, and that he was startled awake by the doors locking, someone speaking, or the vehicle going over a bump in the road. In addition, expert testimony was presented that at the time the revolver discharged, McIver was not holding it upright in a raised position, but rather that the gun was lying sideways and resting on his lap. Some evidence was also presented that McIver suffered from a sleep-related disorder that could produce involuntary movements when he was awakened or startled.

65

From this evidence, the jury could have concluded that the revolver was not deliberately or intentionally fired, but rather, as McIver suggests, discharged as a result of his being startled awake, reflexively or involuntarily clutching at the bag holding the firearm, and inadvertently contacting the trigger. While the jury could have found from the evidence that the shooting that killed Diane was an accident under OCGA § 16-2-2, the jury also could have concluded that, while it was not unlawful for McIver merely to have a loaded revolver in his lap in the back seat of the vehicle, he was criminally negligent in his manner of handling it by keeping it in his lap unsecured, without a holster and in a plastic bag, in a moving vehicle with two other people in the front seats, and by allowing himself to doze off while the gun was so situated.[52] This is at least slight evidence that the fatal discharge of the firearm was a lawful

---

[52] The State asserted at oral argument that not even slight evidence was presented that the gun was handled in an unlawful manner. However, as McIver points out, the State argued at trial that McIver was unsafe in handling the gun by not giving the gun back to his wife or placing it on the floor or on the seat beside him, by failing to return the gun to its available holster, and by failing to exercise "muzzle awareness" by keeping the gun loose in a plastic bag, thus placing Diane "in that kind of danger."

act but performed in a criminally negligent manner, but not necessarily statutory reckless conduct — an act performed in conscious disregard of a substantial and unjustifiable risk of harm to another amounting to a gross deviation from a reasonable standard of care.[53]

We need not decide whether we believe that McIver's conduct was only criminally negligent in manner, or instead amounted to statutory reckless conduct under OCGA § 16-5-60 (b).

> [W]e must decide only whether there was slight evidence to support the jury instruction. . . . And if there was slight evidence supporting the instruction — and there was — it is irrelevant whether we find that slight evidence persuasive in the face of contrary evidence; that question was reserved exclusively for the jury.

*Daly v. Berryhill*, 308 Ga. 831, 834 (843 SE2d 870) (2020). The evidence at trial constituted the slight evidence necessary to support an instruction on unlawful manner involuntary manslaughter, and we therefore conclude that the trial court erred in refusing to give

---

[53] A jury, of course, could also conclude that McIver was guilty of the statutory offense of reckless conduct, and hence of unlawful act involuntary manslaughter.

McIver's requested instruction on this point.

(h) *Determining harmful error.*

Having determined that the trial court erred, we next must consider whether the error was harmful so as to require reversal of McIver's convictions. "The test for determining whether a nonconstitutional instructional error was harmless is whether it is highly probable that the error did not contribute to the verdict." (Citations and punctuation omitted.) *Jones v. State*, 310 Ga. 886, 889 (2) (855 SE2d 573) (2021). And in determining whether such an error is harmless, we assess the evidence from the viewpoint of reasonable jurors, not in the light most favorable to the verdicts. See *Thompson v. State*, 302 Ga. 533, 542 (III) (A) (807 SE2d 899) (2017).

Here, we cannot say that the error was harmless, because the evidence of McIver's guilt of aggravated assault and felony murder was not overwhelming or even strong, and the evidence of criminal intent was disputed and circumstantial. Indeed, the State's evidence of intent was weak, as no witness testified to any disagreement or quarrel between McIver and Diane, and many witnesses testified

68

that they were very much in love. The State's evidence largely focused on a possible financial motive for McIver to murder Diane, but as McIver notes, the evidence connecting that alleged motive to any actions that McIver took to intentionally kill his wife was thin. The State's murder theory — that McIver intentionally shot his wife in the back in a moving car, with her best friend as a witness, through a thin plastic bag and through the back of a seat that could have diverted the bullet, while aiming so low as to potentially miss any vital organs — is supported only by some circumstantial evidence and conjecture; to the contrary, the circumstances of the shooting suggest a lack of any preparation or planning. Indeed, the only witness to the fatal shooting testified that shortly before asking for his gun, McIver had fallen asleep in the back seat and that he appeared to have fallen asleep again after that, an unlikely action for someone intending to commit a murder.

Perhaps aware of the weakness of the State's case, the prosecutor argued to the jury, without citing any particular evidence, that McIver must have planned to murder Diane earlier,

69

at the ranch, but was prevented from doing so by the presence of Carter, and was so committed to killing Diane that day that he "ha[d] to go to maybe a Plan B" in the vehicle. But, once again, the evidence presented by the State provides little if any support for this theory. If McIver intended to fatally shoot Diane, why would he do it in the presence of Carter, and why would he do it in midtown Atlanta, within a few miles of several major hospitals, instead of on a rural interstate, far from any medical aid? The prosecutor argued that McIver put the gun in a plastic bag to avoid DNA or gunshot residue, even though Diane was the one who handed him the gun already in the plastic bag, and given the circumstances there could be little doubt that he was the person who discharged the gun. On the other hand, the State's evidence that McIver gave varying statements to hospital personnel, the police, and others describing how the incident occurred, and that some hospital personnel thought that McIver was not grieving "appropriately" lend some support to the State's murder theory, but not much.

As McIver also points out, the refusal of his request to charge

the jury on unlawful manner involuntary manslaughter "deprived [him] of the benefit of one of [his] defense theories — maybe the stronger one — and thus deprived [him] of the chance for the jury to convict [him] of [a] misdemeanor[ ] rather than felonies." *Shah v. State*, 300 Ga. 14, 22 (2) (b) (793 SE2d 81) (2016). In *Shah*, the appellant was found guilty of felony murder and two counts of first-degree cruelty to children in connection with the death of her infant daughter due to dehydration and probable hyperthermia. The State's medical examiner had concluded that the death was accidental. See id. at 16 (1) (b). The trial court refused the appellant's request to charge the jury on the misdemeanor of statutory reckless conduct as a lesser included offense of the felonies of first-degree cruelty to children under OCGA § 16-5-70 (a) and (b). Shah's counsel argued that the appellant's conduct was not intentional, and asserted the theory of accident as a defense, but also conceded in his opening statement that the jury might find that her conduct had been "reckless." Id. at 22 (2) (b). The trial court refused to charge the jury on statutory reckless conduct, thereby preventing

71

counsel from including this alternative and likely stronger theory in his closing argument.

We noted that Shah's counsel's seeking to present two alternative theories was "not an unreasonable strategy" under the circumstances of that case, noting that "criminal defendants often offer dissonant defense theories, particularly with regard to levels of criminal intent when the result of the defendant's actions was undeniably tragic and the jury may be inclined against finding the defendant entirely innocent." *Shah*, 300 Ga. at 22 (2) (b). Concluding that the appellant was deprived of an important defense by the trial court's refusal to give the requested charge, that some evidence supported the lesser included offense, and that the evidence of the greater offense was not overwhelming, we held that the error was harmful and reversed the convictions. See id. at 23 (2) (b).

Here, as in *Shah*, McIver's main defense theory at the outset was accident — lack of any criminal mens rea — which was the only theory set forth in his counsel's opening statement. In closing, McIver again asserted the accident theory, and while his counsel

mentioned statutory reckless conduct as a basis for finding unlawful act involuntary manslaughter, it was only to argue that the facts did not meet the statutory definition of that felony offense.[54] But counsel was prevented from arguing the theory of unlawful manner involuntary manslaughter based on criminal negligence by the trial court's refusal to give his requested charge on that theory. And this theory was important to McIver, given that his age at the time of trial — almost 76 — deterred his counsel from suggesting to the jury any felony outcome — including unlawful act involuntary manslaughter — as he might not live long enough to serve even a ten-year sentence.

The jury could have concluded — as McIver argued — that the evidence presented here did not meet the statutory definition of reckless conduct as correctly given by the trial court, involving as it does both conscious disregard of a substantial and unjustifiable risk of harm to another and a gross deviation from a reasonable standard

---

[54] The State, on the other hand, mentioned reckless conduct in closing only to argue that it had proved McIver's actions were intentional, not reckless.

of care. But the jury was given no alternative instruction regarding criminal negligence, a mental state more culpable than pure accident and arguably more consistent with the evidence at trial. This foreclosed the possibility of a finding that McIver was criminally negligent but did not meet the definition of reckless conduct, which would have enabled the jury to find that McIver was not entirely guiltless, but guilty only of unlawful manner involuntary manslaughter.

The trial court's refusal to give the requested instruction on unlawful manner involuntary manslaughter deprived McIver of the opportunity to argue an alternative theory of defense that may have been stronger than those permitted by the trial court, and to offer to the jury an opportunity to convict him of a lesser offense without entirely exonerating him from criminal responsibility for a tragic and deadly event.

Moreover, considering the jury instructions as a whole, see *Stafford*, 312 Ga. at 820 (4), the trial court compounded its error in omitting a charge on unlawful manner involuntary manslaughter in

two ways. First, the court instructed the jury that accident involves "no criminally negligent behavior such as reckless conduct." Second, it instructed the jury, "[I]f you don't find beyond a reasonable doubt that his conduct constituted reckless conduct, then you are dealing with an unintentional situation along the lines of accident." More than mere omission, these instructions expressly foreclosed any consideration of unlawful manner involuntary manslaughter, even though there was evidence to support a finding of mere criminal negligence.

The effect of the omission of an instruction on unlawful manner involuntary manslaughter is suggested by the jury's questions to the trial court during its lengthy deliberations, repeatedly expressing concerns regarding the question of McIver's intent and ultimately stating after four-and-a-half days of deliberations that it was deadlocked on that very question.[55] See *Davidson v. State*, 304 Ga.

---

[55] During its deliberations, the jury sent out numerous questions to the trial court, beginning with, "If not guilty on 1 through 4 [malice murder, felony murder, aggravated assault, and possession of a firearm during the commission of a felony], can number 5 [influencing a witness] be guilty?" then

460, 471 (4) (819 SE2d 452) (2018) (concluding constitutional error was not harmless, in part because the jury asked for recharge on issues implicated by error); *Bracewell v. State*, 243 Ga. App. 792, 796 (2) (534 SE2d 494) (2000) (concluding error in charge was harmful, in part because the jury asked twice for recharges and "[c]larity in this portion of the charge was critical to an issue of defense." (Citation and punctuation omitted)). Indeed, the jury ultimately found McIver not guilty of malice murder.

The State asserts that the error is harmless because the jury rejected the lesser included offense of unlawful act involuntary manslaughter in finding McIver guilty of felony murder based on aggravated assault, which means that the jury found that McIver intended to shoot Diane, thereby causing a violent injury, but did

---

asking to view the vehicle and to watch the video of McIver's police interview again. After further deliberations, the jury asked, "How does intent affect the charge of aggravated assault with a deadly weapon?" and, "For an assault to occur, does there need to be intent to cause violent injury or just an action that causes violent injury?" Then, on the fifth day of deliberations, the jury sent out a note to the trial court stating, "We don't see a path to overcome our differences on the defendant's intent related to charges 1, 2, 3, and 5." Over McIver's objection, the trial court delivered an *Allen* charge to the jury, and shortly thereafter the jury reached its verdicts.

not intend to kill her, given that the jury acquitted him of malice murder. Even assuming that is a correct interpretation of what the jury's verdicts signified, the jury reached its verdicts without a complete instruction on the grades of culpability between accident and felony murder, thus "depriv[ing] the jury of the necessary tools to evaluate the charges against [McIver] and to reach a verdict." *Henry v. State*, 307 Ga. 140, 146 (2) (c) (834 SE2d 861) (2019). This is particularly true in light of McIver's desire to avoid a felony conviction arising out of statutory reckless conduct: his inability to argue criminal negligence as the basis for a misdemeanor conviction of unlawful manner involuntary manslaughter deprived him of the benefit of a strong theory of defense, and certainly the most advantageous theory short of an outright acquittal on the basis of accident. See *Shah*, 300 Ga. at 22 (2) (b). In light of all these circumstances, we cannot say it is highly probable that the trial court's error in refusing the requested instruction did not contribute to the jury's verdicts, and reversal therefore is required.

We note that, as a matter of constitutional due process, the

evidence presented at trial and summarized above was, when viewed in the light most favorable to the verdicts, legally sufficient to authorize a rational jury to find McIver guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). Therefore, although we reverse McIver's convictions for felony murder based on aggravated assault and possession of a firearm in the commission of a felony based on the instructional error, the State may choose to retry McIver on the counts as to which the jury returned a verdict of guilty as well as the lesser included offense of unlawful act involuntary manslaughter, as to which the jury did not return a verdict. See *Doyle v. State*, 307 Ga. 609, 615 (2) n. 5 (837 SE2d 833) (2020).

3. Because we are reversing some of McIver's convictions, we next consider those evidentiary issues that are likely to recur if the State elects to retry McIver.[56] All these issues concern evidence

---

[56] In addition to the instructional errors addressed in this opinion, McIver enumerated two other claims of trial court error, which involve the

admitted at trial that McIver contends was irrelevant, speculative, or prejudicial.

(a) OCGA § 24-4-401 ("Rule 401") defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

> Although this relevance standard is a liberal one, it is not meaningless or without boundaries. Any evidence that fails to meet this standard will be barred by OCGA § 24-4-402 ("Rule 402"), which provides, without exception, that "[e]vidence which is not relevant shall not be admissible." A trial court's decision whether to admit or exclude evidence is reviewed on appeal for an abuse of discretion.

(Citations and punctuation omitted.) *Martinez-Arias v. State*, 313 Ga. 276, 285 (3) (869 SE2d 501) (2022).

> Moreover,

> relevant evidence may be excluded under OCGA § 24-4-403 [("Rule 403")] "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations

jury's deliberations. These claims concern the interruption of deliberations to permit a second inspection of, and experiments with, the vehicle and firearm involved, and the giving of an *Allen* charge. These claimed errors are unlikely to recur if the State elects to retry McIver, so we do not address them.

of undue delay, waste of time, or needless presentation of cumulative evidence." The major function of Rule 403 is to exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.

(Citations and punctuation omitted.) *Lofton v. State*, 309 Ga. 349, 355 (2) (b) (846 SE2d 57) (2020). And while relevance is a binary concept — evidence is either relevant or not — probative value is relative:

> Evidence is relevant if it has "*any tendency*" to prove or disprove a fact, whereas the probative value of evidence derives in large part from the *extent to which* the evidence tends to make the existence of a fact more or less probable. Generally speaking, the greater the tendency to make the existence of a fact more or less probable, the greater the probative value. And the extent to which evidence tends to make the existence of a fact more or less probable depends significantly on the quality of the evidence and the strength of its logical connection to the fact for which it is offered. Probative value also depends on the marginal worth of the evidence — how much it adds, in other words, to the other proof available to establish the fact for which it is offered. The stronger the other proof, the less the marginal value of the evidence in question. And probative value depends as well upon the need for the evidence. When the fact for which the evidence is offered is undisputed or not reasonably susceptible of dispute, the less the probative value of the evidence.

(Citations, punctuation and footnotes omitted; emphasis in original.) *Olds v. State*, 299 Ga. 65, 75-76 (2) (786 SE2d 633) (2016). We consider each of McIver's evidentiary contentions in turn.

(b) McIver complains of the State's introduction of evidence of Diane's supposed second will, which the trial court characterized as "powerful evidence of motive." As noted above in footnote 6, the evidence that such a will existed was very slight, consisting of a statement allegedly made by Diane about two years before her death referring to an unidentified document as "my new will." No second will was ever found despite an intensive search;[57] the McIvers' estate planning attorneys knew of no such will; and no evidence was presented of the supposed will's contents or whether its provisions were advantageous, disadvantageous, or neutral to McIver. Moreover, no evidence was presented that McIver knew of such a will or its contents, or had access to it.

Yet the State argued that the mere existence of a supposed

---

[57] The State executed search warrants at the offices of the McIvers' attorneys, and an advertisement was placed in the legal organ of the county seeking any attorney who had drafted such a will.

second will, with no evidence of its provisions or of McIver's knowledge of or access to it, was relevant to show that he had a financial motive to kill Diane and to show that when he shot her, he did so with the intent to kill or at least violently injure her. The State noted that the supposed second will theoretically could have left all Diane's property to someone other than McIver, including her interest in the ranch property. But, as McIver points out, the supposed second will could not have affected the disposition of Diane's interest in the ranch property, because the McIvers held the property as joint tenants with right of survivorship. See OCGA § 44-6-190; see also *Biggers v. Crook*, 283 Ga. 50, 52-53 (1) (656 SE2d 835) (2008) (noting that OCGA § 44-6-190 (a) (3) provides for a "*lifetime transfer of all or a part*" of a joint tenant's interest. (Emphasis supplied.)).

Moreover, as to Diane's other property, the State's argument required the jury to make a series of increasingly speculative inferences: (1) that Diane executed or intended to execute a second will; (2) that the provisions of the will were disadvantageous to

82

McIver in some way; (3) that McIver knew of the new will; (4) that McIver knew the contents of the new will; and (5) that McIver therefore had a motive to kill Diane to prevent her from executing the new will or, if she had already executed it, to kill her so that he could obtain and destroy all copies of the new will. Without any additional evidence, the chain of inferences between the evidence in question and any legally relevant point "is simply too long, dubious, [and] attenuated" to allow the evidence to be introduced. *State v. Stephens*, 310 Ga. 57, 60-61 (1) (849 SE2d 459) (2020) (affirming trial court's exclusion of evidence requiring series of unproven inferences to connect defendant with murder weapon). See also *Olds*, 299 Ga. at 75 (2) n.14 (noting "'the number of intermediate propositions between the item of evidence and the ultimate consequential fact that the item is offered to prove'" as tending to diminish probative value. (Citations omitted.)). Here the State's evidence arguably showed the *possibility* of a second will, and such a will might be relevant to motive if evidence of its provisions and McIver's knowledge of its existence were shown. However, the State

83

here did not offer evidence sufficient to "make the existence of any fact that is of consequence to the determination of the action more probable or less probable" under Rule 401. It was therefore irrelevant and inadmissible, and the trial court abused its discretion in admitting it.

(c) McIver also complains of the State's introduction of evidence regarding OCGA § 53-1-5, sometimes referred to as the "slayer statute," which the trial court also characterized as "powerful evidence of motive."[58] Prosecution witnesses testified that the statute imposed a forfeiture on any person found guilty of "intentional" homicide, and would apply to Diane's extant will and possibly to the joint tenancy of the ranch property.

But the connection between this evidence and a motive for

---

[58] OCGA § 53-1-5 (a) provides:

> An individual who feloniously and intentionally kills or conspires to kill or procures the killing of another individual forfeits the right to take an interest from the decedent's estate and to serve as a personal representative or trustee of the decedent's estate or any trust created by the decedent. For purposes of this Code section, the killing or conspiring to kill or procuring another to kill is felonious and intentional if the killing would constitute murder or felony murder or voluntary manslaughter under the laws of this state.

McIver's alleged intent to kill or injure Diane is tenuous at best. As the trial court observed at the hearing on McIver's motion for new trial, "It seems like it would cut against the financial motive," because it would prevent McIver from receiving any interest in Diane's estate and possibly the ranch property as well. Neither the Attorney General nor the District Attorney addresses this issue in their briefs, asserting in conclusory fashion that testimony regarding the slayer statute was evidence of motive and thus relevant.[59] The State also fails to address why McIver, if he were trying to avoid the effect of the slayer statute while intentionally killing Diane for financial gain, would do so in circumstances where there could be no question that he shot Diane, in the presence of her best friend. Without more, this evidence was not relevant to demonstrate a motive for McIver to murder Diane or his intent to

---

[59] Both the District Attorney and the Attorney General rely heavily upon the assertion that McIver invited testimony regarding the slayer statute in questioning a witness, and thus cannot complain of its introduction. McIver argues in reply that the witness' answer was non-responsive and counsel interposed an objection. But we assume that this will not recur on any retrial.

kill her, and it should have been excluded.[60]

(d) McIver next complains that evidence of the cataloging of Diane's possessions, as well as the auction of her jewelry, furs, and other items months after her death, was irrelevant to any issue in the case and should not have been admitted. The State argued at trial that this evidence showed that McIver had no sentimental attachment to Diane's personal items, indicating that he did not love her, only wished to obtain her money, and thus had a motive for killing her.

---

[60] McIver also asserts that the prejudicial effect of this evidence substantially outweighs any probative value under Rule 403, arguing strenuously that the State's purpose in presenting evidence of the slayer statute was to convince the jury to return a verdict of guilty at least as to felony murder. We agree. He points out that the witnesses testified, and the prosecutor emphasized, that a conviction for an *intentional* killing would prevent McIver from inheriting any portion of his wife's estate. This evidence had an undue tendency to suggest that the jury should find McIver guilty of murder rather than involuntary manslaughter in order to punish him by barring him from inheriting Diane's property, which would be an improper basis for decision. Thus, even if relevant, the at best minimal probative value of the evidence was substantially outweighed by the danger of unfair prejudice. See *Old Chief v. United States*, 519 U. S. 172, 180 (II) (B) (1) (117 SCt 644, 136 LE2d 574) (1997) (observing that evidence may create a danger of unfair prejudice when it has "the capacity . . . to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged" or has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." (Citations and punctuation omitted.)). So the evidence should have been excluded under Rule 403 as well.

We agree that the evidence is relevant. The attorney for Diane's estate explained at some length the manner in which the estate was administered, and his fairly extensive role in advising McIver, because he believed that McIver had never acted as an executor before. The attorney testified that one of an executor's first duties is to locate all the assets of the estate, although several of Diane's friends testified that the cataloging of her possessions made them uncomfortable. The attorney further explained that he, not McIver, suggested the sale of Diane's personal property, because he reviewed the records of the estate and determined that there was not sufficient cash in the estate to satisfy the specific bequests listed in the will. For that reason, he advised McIver to sell Diane's clothing, jewelry, and furs to meet the immediate needs of the estate, because those items were very stylish, expensive, one-of-a-kind items that would lose their value over time. McIver agreed with this recommendation, and the property was sold at auction.

As the State argues, this evidence was relevant to show a financial motive on McIver's part in agreeing to an early sale of

Diane's property, because the cataloging and immediate sale of the property, while not directly providing monetary gain to him, would move the administration of the estate forward and thus contribute to his earlier receipt of the remaining estate assets.[61] See *Slakman v. State*, 280 Ga. 837, 841 (2) (b), 842 (3) (632 SE2d 378) (2006) (evidence of defendant's participation in probate proceeding admissible as logically tending to show defendant's "greed and his desire for financial gain from his wife's death"). In addition, this evidence was relevant to show McIver's indifference to Diane's memory, which would also go to motive.[62] We therefore cannot say that the trial court abused its discretion in ruling that this evidence

---

[61] Diane's will provided that, after specific bequests of real and personal property to McIver and others, and the distribution of furnishings, art, "jewelry, clothing and other such personal effects" according to a list referenced by the will, the residue of the estate was to be placed in a trust for McIver's benefit.

[62] In his brief, McIver argues only that this evidence was not relevant and does not assert that it should have been excluded under Rule 403. In any event, while the probative value of this evidence was low, because of the attorney's initiation of the sale, the lack of a direct benefit to McIver, and the small monetary amount involved compared to the overall value of the estate — the State presented evidence that Diane's estate was worth between $3.6 and $4.6 million at her death, while the sale realized $67,848 — any prejudicial effect likewise seems small.

was relevant.

(e) McIver also complains that the State improperly elicited testimony regarding the relative merits of Emory Hospital and Grady Hospital with regard to treating gunshot wounds and their distance from the site of the shooting, ostensibly to show that McIver intentionally directed Carter to drive to Emory in order to delay Diane's treatment and increase the likelihood of her death. As noted above in footnote 4, the State acknowledged during oral argument in this Court that no evidence was presented at trial that McIver believed that Grady was better equipped than Emory to treat gunshot wounds or that he intentionally directed Carter to drive to Emory to avoid going to Grady. Accordingly, this evidence was not relevant and should have been excluded.

(f) We reach a different conclusion with regard to evidence of McIver's demeanor at the hospital. McIver complains that the State elicited irrelevant testimony from hospital personnel that McIver shed "no tears" when told that Diane had died, that he was very calm, and that he did not appear to be upset or distraught. From

this, the State argued in closing that McIver "show[ed] none of the universal signs of grief." The trial court denied McIver's motion in limine to exclude this evidence and admitted it at trial over his objection. Evidence of a defendant's "condition and demeanor" near the time of the alleged crimes generally is relevant and admissible, see *Morgan v. State*, 307 Ga. 889, 895 (3) (a) (838 SE2d 878) (2020), including witness testimony regarding his or her "perception of [the defendant's] demeanor at that time." (Citations omitted.) *Snipes v. State*, 309 Ga. 785, 792 (3) (b) (i) (848 SE2d 417) (2020). McIver makes no argument that would take the challenged evidence outside the operation of this general principle. Accordingly, the trial court did not abuse its discretion in admitting this testimony about McIver's demeanor at the hospital.

(g) Finally, McIver contends that the State used a "constant drumbeat of racial animus" to "inflame the passion of the jury," pointing both to evidence and argument by the State to support this contention.

First, a witness testified that McIver told him why he asked for

his gun when Diane and Carter decided to take the Edgewood Avenue exit from the Downtown Connector: "He [i.e., McIver] was concerned because of the people that were around, homeless people, maybe they were carjackers. I didn't know who they all were. Maybe they were Black Lives Matter protesters." McIver asserts that the State brought one of the charges of influencing a witness — as to which the trial court granted a directed verdict of acquittal — for the sole purpose of getting this testimony admitted at trial by the witness in question, and that its probative value was substantially outweighed by the danger of unfair prejudice and thus should have been excluded under Rule 403.

Even putting aside the relevance of this testimony to the witness-influencing count, McIver's statement was relevant to show what he was thinking in the time leading up to the shooting, and it was highly probative on that issue because it was McIver's own description of why he asked for his gun. While McIver argues that the testimony implied that he was prejudiced against the protesters on account of their race and thus that he was a person of bad

character, any such prejudice did not substantially outweigh the probative value of the testimony. Accordingly, the trial court did not abuse its discretion in admitting this evidence. See *Edwards v. State*, 308 Ga. 176, 183 (2) (839 SE2d 599) (2020) (appellant's explanation in recorded telephone call of events surrounding fatal shooting was "highly probative" even though it "may have cast appellant in a prejudicial light").

For similar reasons, we conclude that the trial court did not abuse its discretion in admitting the testimony of Dr. Marty Sellers, one of the two doctors who told McIver that Diane had died. Specifically, Dr. Sellers testified that when McIver entered the consulting room, the other doctor, Dr. Blayne Sayed, asked McIver to sit down, and McIver responded, "Don't tell me what to do, boy." McIver moved in limine to exclude this evidence as irrelevant and unfairly prejudicial because it would "[a]ppeal to racial bias" and "inject . . . racial issues into a trial that has nothing to do with race." The record shows, however, that Dr. Sayed did not testify at trial, and Dr. Sellers did not testify about Dr. Sayed's race, ethnicity, or

92

age. The trial court ruled that this testimony was relevant as it showed McIver's statements and demeanor during the aftermath of the shooting, and that its probative value was not outweighed by any unfair prejudice. We conclude that the trial court did not abuse its discretion in so ruling.[63]

> Evidence is intrinsic when it pertains to the chain of events explaining the context, motive, and set-up of the crime, and is admissible so long as it is linked in time and circumstances with the charged crime, forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury. There is no bright-line rule regarding how close in time evidence must be to the charged offenses, or requiring evidence to pertain directly to the victims of the charged offenses, for that evidence to be admitted properly as intrinsic evidence.

(Citations and punctuation omitted.) *Hughes v. State*, 312 Ga. 149,

---

[63] The trial court also stated that this evidence was admissible to impeach by contradiction the testimony elicited by the defense on cross-examination portraying McIver as a grieving husband and "the consummate Southern gentleman who's polite to everyone . . . [and] just an all around super good guy." But a character trait may be proved or rebutted only by testimony as to reputation or in the form of an opinion, unless the character trait "is an essential element of a charge, claim, or defense or when an accused testifies to his or her own character." (Citations and punctuation omitted.) *Griffin v. State*, 309 Ga. 860, 873 (5) (b) (849 SE2d 191) (2020) (citing OCGA § 24-4-405). Dr. Sellers' testimony as to a single instance of conduct on McIver's part did not fall within this rule.

152 (1) (861 SE2d 94) (2021). Evidence of McIver's statements at the hospital, shortly after the shooting and at or near the time of Diane's death, was closely linked in time and circumstances to the shooting and was an integral part of the account of the event. And while intrinsic evidence may be excluded under Rule 403 if its probative value is substantially outweighed by unfair prejudice, see *Hughes*, 312 Ga. at 153 (1), this evidence, while not particularly probative, was also not particularly prejudicial, especially given that Dr. Sayed did not testify at trial and his age and ethnicity were not made known to the jury. Therefore, the trial court did not abuse its discretion in admitting this testimony.

Finally, with respect to McIver's contentions as to improper argument by the State in which it was stated or implied that McIver harbored racial prejudice, we caution the State and the trial court to be mindful of the impropriety of such arguments if there is a retrial. While several portions of the State's closing argument were

questionable,[64] we note particularly and with disapproval the prosecutor's display of a PowerPoint slide with a bullet point reading "KKK" during his closing argument.[65] Questioned at oral argument in this Court, the State ultimately acknowledged that no evidence was produced at trial to support any inference that the Ku Klux Klan was relevant to this case.

McIver enumerates the prosecutor's conduct as error, and he included in his appellate brief a still frame from a video recording of the prosecutor's closing argument, showing the prosecutor gesturing toward the offending slide in the courtroom. But McIver did not object at trial, and "we do not review unpreserved challenges to closing arguments in non-death penalty cases, even for plain error." *Moon v. State*, 311 Ga. 421, 426 (4) (858 SE2d 18) (2021).

While this instance of the prosecutor's conduct therefore

---

[64] As McIver notes, the State emphasized in closing argument both the Black Lives Matter statement and the statement to Dr. Sellers, making several pointed comments that, from the cold transcript, appear aimed at suggesting that McIver was racially biased.

[65] This bullet point appeared on the PowerPoint slide immediately below one referencing "Black Lives Matter" protesters.

cannot be reviewed as potential reversible error, we strongly caution the State that this or any similar behavior is not to be repeated upon any retrial of this case. We have repeatedly noted that in the absence of relevance, "racial bias or prejudice should not be injected into the proceedings, as such issue could tend to destroy the impartiality of the jury and because it would not be relevant." (Citation and punctuation omitted.) *Merritt*, 311 Ga. at 884 (3); see also *Boring v. State*, 289 Ga. 429, 434 (711 SE2d 634) (2011) (link between evidence and appellant's purported satanic beliefs was "forged only via the State's opening statement and closing argument, which itself was improper."). Moreover,

> [t]he responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict. . . . It has often been stated that it is the duty of a prosecuting attorney to see that justice is done and nothing more. That duty should not be forgotten in an excess of zeal or the eager quest for victory in his case. The people of the state desire merely to ascertain beyond a reasonable doubt that the accused is guilty of the crime charged, and do not countenance any unfairness upon the part of their representatives in court.

(Citations and punctuation omitted.) *Carr v. State*, 267 Ga. 701, 712

(10) (482 SE2d 314) (1997), overruled in part on other grounds by *Clark v. State*, 271 Ga. 6, 10 (5) (515 SE2d 155) (1999); see also *Smith v. State*, 288 Ga. 348, 355-356 (10) (b) (703 SE2d 629) (2010) ("In this regard, we must remind all prosecutors in this State that it is not their job to pursue stunts and antics during their closing arguments that are designed merely to appeal to the prejudices of jurors.")

*Judgment affirmed in part and reversed in part. All the Justices concur, except Peterson, J., not participating, and LaGrua, J., disqualified.*

Decided June 30, 2022.

Murder. Fulton Superior Court. Before Judge McBurney.

*Bruce S. Harvey; Garland Samuel & Loeb, Donald F. Samuel, Amanda C. Palmer*, for appellant.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, Ruth M. Pawlak, Kevin C. Armstrong, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Leslie A. Coots, Assistant Attorney General*, for appellee.