**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**May 26, 2023**

# In the Court of Appeals of Georgia

A23A0609. HUGHES v. ACE AMERICAN INSURANCE COMPANY.

BROWN, Judge.

Kenneth Hughes appeals from the trial court's order granting Ace American Insurance Company's ("Ace Insurance") motion for summary judgment. Hughes asserts that a genuine issue of material fact exists as to whether a passenger van insured by Ace was owned or operated by a "motor carrier" under OCGA § 40-1-100 et seq. For the reasons explained below, we disagree and affirm.

To prevail at summary judgment, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the nonmovant's favor, warrant judgment as a matter of law. We review de novo a trial court's [grant or] denial of summary judgment, construing the evidence in a light most favorable to the nonmoving party.

(Citation and punctuation omitted.) *Mornay v. Nat. Union Fire Ins. Co. of Pittsburgh, PA.*, 331 Ga. App. 112 (769 SE2d 807) (2015).

So viewed, the record shows that a seven-passenger Dodge Caravan driven by Jeremiah Belk collided with a Chevrolet Colorado truck driven by Kenneth Hughes after Belk made an improper lane change. Hughes filed a complaint, as amended, against Belk's employer, Normal Life of Georgia, Inc. ("Normal Life"), Res-Care, Inc. ("Res-Care"), the parent company of Res-Care, and Ace Insurance, the insurance carrier of Res-Care, asserting various theories of liability for the negligent and/or reckless conduct of Belk. Hughes asserted a direct action claim against Ace Insurance pursuant to OCGA § 40-1-112, based on his contention that Normal Life and Res-Care are motor carriers under OCGA § 40-1-100. The trial court subsequently granted Ace Insurance's motion for summary judgment based on its conclusion that there was no genuine issue of material fact as to whether any of the defendants were a motor carrier.

Georgia's direct action provision of the Georgia Motor Carrier Act ("the Act") states: "It shall be permissible under this part for any person having a cause of action arising under this part to join in the same action the motor carrier and the insurance

carrier, whether arising in tort or contract." OCGA § 40-1-112 (c). See generally *Sapp v. Canal Ins. Co.*, 288 Ga. 681, 682-683 (1) (706 SE2d 644) (2011). "The purpose of permitting joinder of [an insurance company] in a claim against a [motor] carrier is to further the policy of the Motor Carrier Act, that is, to protect the public against injuries caused by the motor carrier's negligence." *Andrews v. Yellow Freight System*, 262 Ga. 476 (421 SE2d 712) (1992). See also *Reis v. OOIDA Risk Retention Group*, 303 Ga. 659, 664, n.12 (814 SE2d 338) (2018) (Noting that former OCGA § 46-7-12 (c) provided: "'It shall be permissible under this article for any person having a cause of action arising under this article to join in the same action the motor carrier and the insurance carrier, whether arising in tort or contract.'"). Additionally, it "enables injured persons to recover compensation more efficiently and quickly and encourages insurers to resolve legitimate claims by settlement." *Grissom v. Gleason*, 262 Ga. 374, 378 (3) (418 SE2d 27) (1992). "Importantly, the direct action statute is in derogation of common law, and its terms require strict compliance." (Citation and punctuation omitted.) *Stubbs Oil Co. v. Price*, 357 Ga. App. 606, 616 (4) (848 SE2d 739) (2020). Cf. *Record Truck Line v. Harrison*, 220 Ga. 289, 291 (1) (138 SE2d 578) (1964) (holding different provision of statutory scheme governing motor carriers in derogation of common law and must be strictly construed).

The first step of the analysis is to determine whether Normal Life and Res-Care fall within the definition of "motor carrier" in the Act. OCGA § 40-1-100 (12) (A) provides that this term

> means: [e]very person owning, controlling, operating, or managing any motor vehicle, including the lessees, receivers, or trustees of such persons or receivers appointed by any court, used in the business of transporting *for hire* persons, household goods, or property or engaged in the activity of nonconsensual towing pursuant to Code Section 44-1-13 for hire over any public highway in this state.

(Emphasis supplied.) OCGA § 40-1-100 (8) defines "'for hire'" to mean "an activity relating to a person engaged in the transportation of goods or *passengers* for compensation." (Emphasis supplied.) And,

> "[p]assenger" means a person who travels in a public conveyance by virtue of a contract, either express or implied, with the *carrier* as to the payment of the fare or that which is accepted as an equivalent therefor. The prepayment of fare is not necessary to establish the relationship of passenger and carrier, although a carrier may demand prepayment of fare if persons enter his or her vehicle by his or her permission with the intention of being carried; in the absence of such a demand, an obligation to pay fare is implied on the part of the passenger, and the reciprocal obligation of carriage of the carrier arises upon the entry of the passenger.

OCGA § 40-1-100 (13). Finally, "'[c]arrier'" is defined to mean "a person who undertakes the transporting of goods or passengers for compensation." OCGA § 40-1-100 (1). Taken together, it is clear from the plain language of the statute that the term "motor carrier" depends in turn on the definition of "for hire," which in turn depends upon the definition of "passenger" found in OCGA § 40-1-100 (13).

Hughes contends that record evidence shows that Normal Life and Res-Care "operate as a joint enterprise" with both companies "employing" and "directing" Belk's activities,[1] which included transporting their clients. In his view, a genuine issue of material fact exists as to "whether the for-profit companies that charged to provide services including transportation over Georgia roadways" fall within the definition of motor carrier. He argues that "[t]he law just requires that one purpose of the vehicle falls within the statutory definition of 'motor carrier' — there is no percentage allocation or analysis of whether the statutorily enumerated services of a motor carrier are 'ancillary' to a business goal."

Ace Insurance, on the other hand, asserts that the van was not used for "the business of transporting people for compensation" and that it was "an entirely

---

[1] Ace asserts that whether the companies acted as a joint venture is irrelevant to whether either entity qualifies as a "motor carrier."

ancillary part of [Normal Life's] service of providing home health care." According to Ace, the defendant companies "are solely in the business of providing rehabilitative home health care support to individuals with disabilities. Neither company . . . [is] compensated for transporting residents — they are paid for caregiving services and would be paid exactly the same if they never transported any resident, ever."

Sharae McMasters, an OCGA § 9-11-30 (b) (6) representative for Normal Life, testified that she is the executive director of southeast operations for Normal Life. She explained that Normal Life, which is a subsidiary of Res-Care, "managed the healthcare and pretty much every aspect of people with intellectual disabilities . . . . Basically, taking care of them . . . in a group home or in a personal home[.]" For the most part, Normal Life followed policies and procedures developed by Res-Care. A "Res[-]Care Corrective Action Form" states: "The Company's mission is to be the best diversified health and human services provider in serving populations of various needs in our communities; creating optimal environments that foster independence, safety, and outcomes, through best-in-class services, an innovative and technology-led approach, and highly engaged people." The declarations page for the business

6

auto policy covering the Dodge Caravan listed Res-Care's business as "job training and vocational rehabilitation services."

Belk worked for Normal Life as direct support staff at two particular group homes and driving was a regular part of his job duties. The Dodge Caravan was used to drive residents of the group home to medical appointments, a drug store to pick up prescriptions, the grocery or a big box store, the library, a park, special events, or just a ride if a resident was restless. Basically, the residents of the group home could "go anywhere they need[ed] or want[ed] to go" in the Dodge Caravan, which would be driven by Normal Life staff. At the time of the accident, Belk was transporting a resident back to the group home; the reason for the trip cannot be determined from the record before us.

In an affidavit submitted at the same time as Ace Insurance's motion for summary judgment, Normal Life's 30 (b) (6) representative averred that

> Normal Life is paid to provide group residential home services for its disabled clients — assisting them with eating, bathing, dressing, mobility, behavioral monitoring and redirection, and other activities of daily living, including general supervision in the home. . . .

7

As an adjunct to those core activities, Normal Life employees sometimes drive clients to various appointments, doctor/medical/psychiatric visits, and similar errands. . . .

Normal Life does not charge extra or separately for transporting clients. Normal Life's expenses for transporting its clients are paid from its general operating budget. Normal Life does not transport residents for its own benefit or revenue, but as a service ancillary to its primary function of operating residential homes for disabled individuals. . . .

Normal Life provides transportation for its clients only, and its transportation services are not held out for hire to the general public.

Having considered the particular facts and circumstances of this case, the requirement that we must strictly construe the Act, and all other relevant rules of statutory construction, see, e.g., *McIver v. State*, 314 Ga. 109, 119-120 (2) (b) (875 SE2d 810) (2022), we conclude that no genuine issue of material fact exists as to whether the Dodge Caravan was a "public conveyance" as that term is used in the statutory definition of "passenger." OCGA § 40-1-100 (13). See *Harlan v. Six Flags over Georgia*, 250 Ga. 352, 353 (297 SE2d 468) (1982) (noting that "elevators, taxicabs, buses, and railroads" are public conveyances). See also *Haulers Ins. Co. v. Davenport*, 344 Ga. App. 444, 446-448 (2) (810 SE2d 617) (2018) (holding ordinary,

8

plain, and unambiguous meaning of term "public conveyance" means the vehicle must be held out indiscriminately to the general public for hire). We therefore affirm the trial court's grant of summary judgment favor of Ace Insurance.

*Judgment affirmed. McFadden, P. J., and Markle, J., concur*.

**NOTICE: Motions for reconsideration must be**
**physically received in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**May 26, 2023**

# In the Court of Appeals of Georgia

A23A0609. HUGHES v. ACE AMERICAN INSURANCE
COMPANY.

BROWN, Judge.

Kenneth Hughes appeals from the trial court's order granting Ace American
Insurance Company's ("Ace Insurance") motion for summary judgment. Hughes
asserts that a genuine issue of material fact exists as to whether a passenger van
insured by Ace was owned or operated by a "motor carrier" under OCGA § 40-1-100
et seq. For the reasons explained below, we disagree and affirm.

To prevail at summary judgment, the moving party must
demonstrate that there is no genuine issue of material fact and that the
undisputed facts, viewed in the nonmovant's favor, warrant judgment as
a matter of law. We review de novo a trial court's [grant or] denial of
summary judgment, construing the evidence in a light most favorable to
the nonmoving party.

(Citation and punctuation omitted.) *Mornay v. Nat. Union Fire Ins. Co. of Pittsburgh, PA.*, 331 Ga. App. 112 (769 SE2d 807) (2015).

So viewed, the record shows that a seven-passenger Dodge Caravan driven by Jeremiah Belk collided with a Chevrolet Colorado truck driven by Kenneth Hughes after Belk made an improper lane change. Hughes filed a complaint, as amended, against Belk's employer, Normal Life of Georgia, Inc. ("Normal Life"), Res-Care, Inc. ("Res-Care"), the parent company of Res-Care, and Ace Insurance, the insurance carrier of Res-Care, asserting various theories of liability for the negligent and/or reckless conduct of Belk. Hughes asserted a direct action claim against Ace Insurance pursuant to OCGA § 40-1-112, based on his contention that Normal Life and Res-Care are motor carriers under OCGA § 40-1-100. The trial court subsequently granted Ace Insurance's motion for summary judgment based on its conclusion that there was no genuine issue of material fact as to whether any of the defendants were a motor carrier.

Georgia's direct action provision of the Georgia Motor Carrier Act ("the Act") states: "It shall be permissible under this part for any person having a cause of action arising under this part to join in the same action the motor carrier and the insurance

2

carrier, whether arising in tort or contract." OCGA § 40-1-112 (c). See generally *Sapp v. Canal Ins. Co.*, 288 Ga. 681, 682-683 (1) (706 SE2d 644) (2011). "The purpose of permitting joinder of [an insurance company] in a claim against a [motor] carrier is to further the policy of the Motor Carrier Act, that is, to protect the public against injuries caused by the motor carrier's negligence." *Andrews v. Yellow Freight System*, 262 Ga. 476 (421 SE2d 712) (1992). See also *Reis v. OOIDA Risk Retention Group*, 303 Ga. 659, 664, n.12 (814 SE2d 338) (2018) (Noting that former OCGA § 46-7-12 (c) provided: "'It shall be permissible under this article for any person having a cause of action arising under this article to join in the same action the motor carrier and the insurance carrier, whether arising in tort or contract.'"). Additionally, it "enables injured persons to recover compensation more efficiently and quickly and encourages insurers to resolve legitimate claims by settlement." *Grissom v. Gleason*, 262 Ga. 374, 378 (3) (418 SE2d 27) (1992). "Importantly, the direct action statute is in derogation of common law, and its terms require strict compliance." (Citation and punctuation omitted.) *Stubbs Oil Co. v. Price*, 357 Ga. App. 606, 616 (4) (848 SE2d 739) (2020). Cf. *Record Truck Line v. Harrison*, 220 Ga. 289, 291 (1) (138 SE2d 578) (1964) (holding different provision of statutory scheme governing motor carriers in derogation of common law and must be strictly construed).

3

The first step of the analysis is to determine whether Normal Life and Res-Care fall within the definition of "motor carrier" in the Act. OCGA § 40-1-100 (12) (A) provides that this term

> means: [e]very person owning, controlling, operating, or managing any motor vehicle, including the lessees, receivers, or trustees of such persons or receivers appointed by any court, used in the business of transporting *for hire* persons, household goods, or property or engaged in the activity of nonconsensual towing pursuant to Code Section 44-1-13 for hire over any public highway in this state.

(Emphasis supplied.) OCGA § 40-1-100 (8) defines "'for hire'" to mean "an activity relating to a person engaged in the transportation of goods or *passengers* for compensation." (Emphasis supplied.) And,

> "[p]assenger" means a person who travels in a public conveyance by virtue of a contract, either express or implied, with the *carrier* as to the payment of the fare or that which is accepted as an equivalent therefor. The prepayment of fare is not necessary to establish the relationship of passenger and carrier, although a carrier may demand prepayment of fare if persons enter his or her vehicle by his or her permission with the intention of being carried; in the absence of such a demand, an obligation to pay fare is implied on the part of the passenger, and the reciprocal obligation of carriage of the carrier arises upon the entry of the passenger.

4

OCGA § 40-1-100 (13). Finally, "'[c]arrier'" is defined to mean "a person who undertakes the transporting of goods or passengers for compensation." OCGA § 40-1-100 (1). Taken together, it is clear from the plain language of the statute that the term "motor carrier" depends in turn on the definition of "for hire," which in turn depends upon the definition of "passenger" found in OCGA § 40-1-100 (13).

Hughes contends that record evidence shows that Normal Life and Res-Care "operate as a joint enterprise" with both companies "employing" and "directing" Belk's activities,[1] which included transporting their clients. In his view, a genuine issue of material fact exists as to "whether the for-profit companies that charged to provide services including transportation over Georgia roadways" fall within the definition of motor carrier. He argues that "[t]he law just requires that one purpose of the vehicle falls within the statutory definition of 'motor carrier' — there is no percentage allocation or analysis of whether the statutorily enumerated services of a motor carrier are 'ancillary' to a business goal."

Ace Insurance, on the other hand, asserts that the van was not used for "the business of transporting people for compensation" and that it was "an entirely

_____

[1] Ace asserts that whether the companies acted as a joint venture is irrelevant to whether either entity qualifies as a "motor carrier."

5

ancillary part of [Normal Life's] service of providing home health care." According to Ace, the defendant companies "are solely in the business of providing rehabilitative home health care support to individuals with disabilities. Neither company . . . [is] compensated for transporting residents — they are paid for caregiving services and would be paid exactly the same if they never transported any resident, ever."

Sharae McMasters, an OCGA § 9-11-30 (b) (6) representative for Normal Life, testified that she is the executive director of southeast operations for Normal Life. She explained that Normal Life, which is a subsidiary of Res-Care, "managed the healthcare and pretty much every aspect of people with intellectual disabilities . . . . Basically, taking care of them . . . in a group home or in a personal home[.]" For the most part, Normal Life followed policies and procedures developed by Res-Care. A "Res[-]Care Corrective Action Form" states: "The Company's mission is to be the best diversified health and human services provider in serving populations of various needs in our communities; creating optimal environments that foster independence, safety, and outcomes, through best-in-class services, an innovative and technology-led approach, and highly engaged people." The declarations page for the business

auto policy covering the Dodge Caravan listed Res-Care's business as "job training and vocational rehabilitation services."

Belk worked for Normal Life as direct support staff at two particular group homes and driving was a regular part of his job duties. The Dodge Caravan was used to drive residents of the group home to medical appointments, a drug store to pick up prescriptions, the grocery or a big box store, the library, a park, special events, or just a ride if a resident was restless. Basically, the residents of the group home could "go anywhere they need[ed] or want[ed] to go" in the Dodge Caravan, which would be driven by Normal Life staff. At the time of the accident, Belk was transporting a resident back to the group home; the reason for the trip cannot be determined from the record before us.

In an affidavit submitted at the same time as Ace Insurance's motion for summary judgment, Normal Life's 30 (b) (6) representative averred that

> Normal Life is paid to provide group residential home services for its disabled clients — assisting them with eating, bathing, dressing, mobility, behavioral monitoring and redirection, and other activities of daily living, including general supervision in the home. . . .

As an adjunct to those core activities, Normal Life employees sometimes drive clients to various appointments, doctor/medical/psychiatric visits, and similar errands. . . .

Normal Life does not charge extra or separately for transporting clients. Normal Life's expenses for transporting its clients are paid from its general operating budget. Normal Life does not transport residents for its own benefit or revenue, but as a service ancillary to its primary function of operating residential homes for disabled individuals. . . .

Normal Life provides transportation for its clients only, and its transportation services are not held out for hire to the general public.

Having considered the particular facts and circumstances of this case, the requirement that we must strictly construe the Act, and all other relevant rules of statutory construction, see, e.g., *McIver v. State*, 314 Ga. 109, 119-120 (2) (b) (875 SE2d 810) (2022), we conclude that no genuine issue of material fact exists as to whether the Dodge Caravan was a "public conveyance" as that term is used in the statutory definition of "passenger." OCGA § 40-1-100 (13). See *Harlan v. Six Flags over Georgia*, 250 Ga. 352, 353 (297 SE2d 468) (1982) (noting that "elevators, taxicabs, buses, and railroads" are public conveyances). See also *Haulers Ins. Co. v. Davenport*, 344 Ga. App. 444, 446-448 (2) (810 SE2d 617) (2018) (holding ordinary,

8

plain, and unambiguous meaning of term "public conveyance" means the vehicle must be held out indiscriminately to the general public for hire). We therefore affirm the trial court's grant of summary judgment favor of Ace Insurance.

*Judgment affirmed. McFadden, P. J., and Markle, J., concur*.

ON MOTION FOR RECONSIDERATION

In a motion for reconsideration, Hughes asserts that this Court should not have affirmed the grant of summary judgment based on the lack of a "genuine issue of material fact as to whether the Dodge Caravan was a 'public' conveyance' as that term is used in the statutory definition of 'passenger.'" Hughes asserts that this Court could not reach this aspect of the statutory meaning of a "motor carrier" because Ace Insurance "did not brief, argue, or otherwise raise the issue of 'public conveyance' within the meaning of OCGA § 40-1-100 (13) in the trial court, nor did it seek summary judgment on that theory."[2]

We find no merit in this hyper-technical view of the issue raised in the trial court, ruled upon by the trial court, and asserted in Hughes' enumeration of error before this Court. The record shows that Ace Insurance sought summary judgment in its favor "because none of the Defendants are a 'motor carrier' under Georgia law." The trial court's order granting summary judgment concluded:

---

[2] Hughes does not contend in his motion for reconsideration that this Court erroneously interpreted the phrase "public conveyance" within the definition of passenger in OCGA § 40-1-100 (13).

10

According to the definitions found at OCGA §§ 40-1-100 (1) [defining "carrier"], (8) [defining "for hire"], (12) (A) [defining "motor carrier"], and (13) [defining "passenger"], the Court finds that Ace American Insurance Company successfully pierced Plaintiff's pleadings by pointing to an absence of facts of record to give rise to a jury question concerning whether any defendant is a motor carrier for the purposes of allowing a direct action against Ace American Insurance Company pursuant to OCGA § 40-1-112 (c).

On appeal, Hughes' enumeration of error states: "Generally, the trial court erred by granting Ace's Motion for Summary Judgment. At a more granular level, the trial court erroneously concluded that no material disputes of fact existed as to whether any defendant is a motor carrier within the meaning of OCGA § 40-1-100." The issue raised below and appropriately ruled upon by both the trial court and this Court was whether Normal Life and Res-Care qualified as a "motor carrier." This Court cannot conduct a legally sound de novo review of the trial court's conclusion that Normal Life and Res-Care were not motor carriers within the meaning of OCGA § 40-1-100 without examining the complete statutory definition of "motor carrier," including the definition of "passenger" relied upon by the trial court. Accordingly, we have not exceeded the proper scope of review on appeal. None of the cases cited in Hughes'

11

motion for reconsideration require a different result as none involved cascading

definitions of terms within a statutory definition inarguably before this Court.