**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0454
Christopher Scott
v.
The State

On Appeal from the Superior Court of Chatham County
No. SPCR1902491J2

Decided: May 19, 2026

PINSON, Justice.

Christopher Scott was convicted of the malice murder of his wife, Tiffany Scott, and possession of a firearm during the commission of a felony.[1] On appeal, he claims that the trial court

---

[1] Tiffany died from a gunshot wound on June 21, 2019. In September 2019, a Chatham County grand jury returned an indictment charging Scott with malice murder, felony murder, aggravated assault, and three counts of possession of a firearm during the commission of a felony. Scott was tried by a jury from May 2 to 4, 2022, and the jury found him guilty of all counts. On June 15, 2022, the trial court sentenced him to life without the possibility of parole for malice murder and a consecutive term of five years in prison for one count of possession of a firearm during the commission of a felony. The trial court purported to merge all remaining counts with the charge of malice murder, but the felony murder count was vacated by operation of law. See *Depriest v. State*, 319 Ga. 874, 874 n.1 (2024).

Scott, through his trial counsel, filed a timely motion for new trial on July 5, 2022. Substitute counsel entered an appearance in February 2023 and filed amended motions for new trial in May and August 2023. After a hearing in November 2023, the trial court denied the motion for new trial on August 14, 2025. Scott timely filed a notice of appeal on August 22, 2025, but directed

erred by not charging the jury on involuntary manslaughter based on reckless conduct and pointing a pistol because there was at least slight evidence to support the charge. For the reasons that follow, we conclude that the trial court did not err by declining to charge the jury on unlawful act involuntary manslaughter based on reckless conduct or pointing a pistol because the evidence showed that Scott instead committed aggravated assault, which cannot be the basis for this charge. And to the extent that Scott claims that the trial court should have charged the jury on lawful act involuntary manslaughter, he failed to preserve that claim for ordinary review, and he has not established plain error because he affirmatively waived any right to that charge by withdrawing his request. So Scott's convictions and sentences are affirmed.

1. *Background*

(a) The evidence at trial showed the following. Scott and Tiffany had been in a relationship for eight years and married for one. They lived together with Tiffany's daughter, and Scott's two children stayed with them every other weekend. Tiffany's daughter, Sierra Lopez, was 19 years old when Tiffany died. Lopez testified that she and Tiffany were close, and Lopez knew that Tiffany had discovered that Scott was having an affair "maybe three weeks before her death." Tiffany planned to leave Scott and had been "approved" for an apartment where she and Lopez planned to move.

Lopez testified that she once saw Scott push Tiffany's forehead with the palm of his hand, causing her glasses to "fl[y] off." She also testified that Scott owned "many" guns and "had pulled

_____

his appeal to the Court of Appeals, which transferred the appeal to this Court. Scott's appeal was docketed to the term of this Court beginning in December 2025 and submitted for a decision on the briefs.

2

a gun on" Tiffany "[o]n a few occasions." Tiffany owned a pistol, and Lopez testified that Tiffany was "not afraid of anything," including Scott. Tiffany would sometimes tell Scott, "shoot me," because she did not believe he would do so.

Katherine Sheffield testified that she and Tiffany were "best friend[s]" during the five years before her death. Sheffield testified that Tiffany confided in her that Scott had cheated and also about "financial problems" in the marriage, including that Scott was spending money on other women. Sheffield testified that she had seen Scott and Tiffany argue before. She also testified that Tiffany planned to leave Scott and had made plans to stay with Sheffield in Tennessee. Scott once told Sheffield that he would kill Tiffany before she could leave him, but Sheffield thought he was joking at the time. Sheffield did not see or speak to Tiffany on the day she died.

Lopez saw Tiffany around 4 p.m. on June 21, 2019, as Tiffany was coming home from work and Lopez was leaving for work. Lopez testified that Tiffany was "distraught" about Scott's adultery at that time.

Scott's two children were staying with him that day. Pursuant to an agreement between Scott and the State, interviews between each child and a child advocate were admitted as evidence and played for the jury. Scott's son, R. S., was 15 years old when Tiffany died. R. S. told a child advocate that Tiffany and Scott had been arguing "for the past few days," which R. S. said was "abnormal." While Tiffany and Scott were making dinner, Tiffany told Scott to go outside, and they both went out to the garage. R. S. could hear raised voices, and then things "progressively got worse." R. S. then "started hearing things getting thrown and yelling, but they both sounded drunk." When Scott came inside, he "sway[ed]."

While Scott was inside, R. S. saw him "reach for something," and then he went back outside and "started screaming at" Tiffany. R. S. heard Tiffany say, "'Shoot me. I dare you' or something," and she sounded "drunk." R. S. then heard Scott say, "'You don't wanna mess with me,' or something, 'You don't wanna mess with me.'" R. S. said that he thought Scott and Tiffany had been in the garage for "[a]t least an hour" when he heard a gunshot.

After the gunshot, Scott came inside and was crying. He told R. S. and his sister to pack their belongings and call someone to pick them up. R. S. called his grandfather and asked him to pick up R. S. and his sister from Scott's home. When his grandparents arrived, R. S. and his sister went outside, and R. S. saw Tiffany's body on the ground.

Scott's daughter (and R. S.'s sister), A. S., was 10 years old when Tiffany died. A. S. told the child advocate that Scott and Tiffany had been arguing "for about an hour" and then Scott "came inside and he got his gun and he shot her." A. S. said that she and R. S. were in the living room watching television and could hear Scott and Tiffany arguing. At one point, A. S. went into the garage to get a soda and saw that Scott and Tiffany were at a table in the corner of the garage. They were "whispering" and A. S. did not hear what they were talking about.

A. S. then went back inside. She "heard some loud noises in the garage" and "heard them throwing stuff around." Scott and Tiffany were "yelling at each other" but A. S. could not hear what was said. Scott came inside and "grabbed his gun off the side table" in the hallway, which A. S. said was where he always kept his gun. Scott then went back to the garage, and A. S. and R. S started to go upstairs. When A. S. was at the stairs, she heard Tiffany say, "shoot me," and then she heard a gunshot "[n]ot long" after she and R. S. reached the top of the stairs.

Scott called for R. S., and A. S. went downstairs with him and saw that Scott was crying. Scott said he was "sorry" and "about to go to jail." Scott told the children to call their mom, but she was out of town, so R. S. and A. S. called their grandparents to come pick them up. Their grandparents arrived "about ten minutes" later. R. S. and A. S. got in their grandparents' car and their grandparents called 911.

Larry Anderson, the maternal grandfather of A. S. and R. S., testified that he was at his daughter's home on June 21, 2019, when R. S. called him. R. S. sounded "upset" and Anderson could hear A. S. crying in the background. R. S. asked Anderson to come get him, and Anderson and his wife drove over. When they arrived, the children ran outside, and Anderson saw a body in the driveway. Anderson drove the children "down the block" and he or his wife called 911.

Matthew Hale, then a corporal for the Port Wentworth police department, responded to a call about a "domestic dispute" and shooting on June 21, 2019. Hale and other officers approached a home on Lakeshore Boulevard and saw Tiffany on her back in the driveway with a "very large pool of blood underneath her head." She "appeared to be alive" and was making "groaning sounds" or "incoherent noises." EMS arrived at the home "about the same time" as law enforcement and took Tiffany to the hospital while Hale and the other officers began to secure the crime scene.

Over the next ten minutes, Hale and another officer checked the perimeter of the home, "walking back and forth," and then Hale saw movement around the blinds or curtains of the screened-in back porch. Scott stepped onto the porch and Hale ordered him to show his hands, which he did. When placing handcuffs on Scott, Hale noticed that Scott's fist was "clenched" and

5

saw what appeared to be bullets or shell casings through the cracks of Scott's fingers. Scott complied when Hale told him to open his hand, and Hale saw that Scott had been holding unfired bullets, which Scott then dropped to the ground. Hale "patted him down" and confirmed that Scott did not have a weapon, just his cell phone and the unfired bullets Scott was then transported to the police department for further questioning.

GBI Special Agent Barry Thompson interviewed Scott after his arrest.[2] Scott told him that he and Tiffany had been "fussing" for two weeks because of Scott's infidelity. He denied that anything "physically happened" between them that night or any other. Agent Thompson did not see any "scratch marks or any signs of any type of physical altercation" on Scott's arms, hands, or face. Scott said he owned a Taurus nine-millimeter gun but could not remember if he had it with him that night. Investigators located that gun and collected it as evidence. The bullets Scott had dropped in the backyard were also collected; they were the same caliber as the gun.

Scott told Agent Thompson that he and Tiffany had both been drinking, and there was evidence that a beer can had been thrown at the windshield of one of their cars, shattering it. Scott also told Agent Thompson that his gun did not have a manual safety. He said "several times" that he did not mean to shoot Tiffany.

On cross-examination, defense counsel asked Agent Thompson if Scott had been wearing a prosthesis on his left leg at the time of his interview, and Agent Thompson said yes. Counsel

---

[2] Agent Thompson testified that Scott waived his *Miranda* rights and agreed to speak to Agent Thompson. See *Miranda v. Arizona*¸ 384 US 436 (1966).

6

then asked if Scott "could have tripped and accidentally shot" Tiffany. Agent Thompson answered that it was "possible" but not "probable."

Tiffany died from a gunshot wound to her head. The GBI medical examiner who performed Tiffany's autopsy testified that Tiffany had a "contact wound," which indicated that the muzzle of the gun was in contact with the skin or body when the bullet was fired, and the bullet appeared to have moved from the front to the back of her head.

2. *Analysis*

Our Code sets out two kinds of involuntary manslaughter. One kind occurs when a defendant unintentionally causes someone's death "by the commission of an unlawful act other than a felony." OCGA § 16-5-3(a). The other occurs when a defendant unintentionally causes someone's death "by the commission of a lawful act in an unlawful manner likely to cause death or great bodily harm." Id. § 16-5-3(b).

At the charge conference during trial, Scott withdrew an earlier request to charge the jury on involuntary manslaughter by the commission of a lawful act in an unlawful manner. He then asked the court to charge involuntary manslaughter by the commission of the unlawful acts of pointing a pistol and reckless conduct. The State argued that involuntary manslaughter by unlawful act was not an appropriate charge because Scott's conduct amounted to aggravated assault, and the unlawful act on which such an involuntary manslaughter charge is based cannot be a felony. The trial court agreed with the State and declined to give the charge, and Scott objected. The trial court did not charge the jury on involuntary manslaughter. When asked whether counsel had any objections to the charge as given, Scott's attorney said,

7

"Only those previously stated, Your Honor. Short of that, none."

On appeal, Scott claims that the trial court should have charged the jury on involuntary manslaughter based on the commission of unlawful acts — here, on reckless conduct and pointing a pistol — because there was at least slight evidence to support the charge. He also cites *McIver v. State* for the proposition that an "unlawful manner" involuntary manslaughter instruction should be given "when there is slight evidence, even if in dispute, that the defendant caused the death of another person in the commission of a lawful act but in a merely criminally negligent manner." 314 Ga. 109, 135 (2022). We address in turn Scott's claims with respect to the lack of a jury instruction on each kind of voluntary manslaughter.

(a) When a defendant requests a charge on unlawful act involuntary manslaughter as a lesser offense of murder, the trial court should give the charge if there is slight evidence to support it. *Moon v. State,* 311 Ga. 421, 424 (2021).[3] But if the evidence shows that the defendant caused the victim's death by committing an unlawful act that was a felony, an involuntary manslaughter instruction should not be given. See id. See also OCGA § 16-5-3(a). This is true even if the act causing the victim's death could amount to both a felony and "a lesser, misdemeanor offense." *Chambliss v. State*, 318 Ga. 161, 167 (2023).

On appeal, Scott contends that an involuntary manslaughter instruction based on reckless conduct or pointing a pistol was warranted based on slight evidence that he "stumbled or slipped" and the gun went off "unintentionally." Not so. Scott contends

---

[3] Scott asked for a charge on unlawful act involuntary manslaughter and objected after the trial court did not give that charge to the jury, so he preserved this claim for ordinary appellate review. *Metz v. State*, 321 Ga. 402, 409 (2025).

that the evidence supporting the charge included Scott's statements to the police that he and Tiffany had been drinking, that he had stumbled or slipped as a result of his newly-acquired prosthetic leg and that his gun, which had no manual safety, had discharged unintentionally, but that he had no intention of shooting her. Although defense counsel asked Agent Thompson if Scott "could have tripped and accidentally shot" Tiffany, and Agent Thompson answered that it was "possible" but not "probable," he did not testify that Scott told him that this was what happened.

This evidence, without more, did not amount to even slight evidence to support an instruction on voluntary manslaughter by unlawful act based on either of the alleged misdemeanors. As to pointing a pistol, Scott points only to evidence that he "possibly" "tripped and accidentally shot" Tiffany, not that he intentionally aimed his gun at her. See OCGA § 16-11-102 ("A person is guilty of a misdemeanor when he intentionally and without legal justification points or aims a gun or pistol at another, whether the gun or pistol is loaded or unloaded."). And although reckless conduct conceivably could occur if a person "tripped and accidentally shot" another person because he "consciously disregard[ed] a substantial and unjustifiable risk" of harm that was "a gross deviation from the standard of care which a reasonable person would exercise in the situation," see OCGA § 16-5-60, the record does not contain evidence in support of such a theory here (and indeed, Scott does not appear to argue that it does). Cf. *Manzano v. State*, 282 Ga. 557, 558–60 (2007), *disapproved of in part by McIver*, 314 Ga. at 135 & n.48 (trial court erred in refusing request for jury charge on involuntary manslaughter based on unlawful act of reckless conduct because testimony that the defendant and victim both believed the gun was unloaded when he pointed it at her and pulled the trigger during "horseplay" was slight evidence of criminal negligence). Absent evidence that Scott committed either of

9

these misdemeanors, a voluntary manslaughter by unlawful act based on either one of them was not warranted.

Moreover, the evidence admitted at trial showed that Scott committed aggravated assault, not those lesser offenses. That evidence showed that Scott retrieved his gun during an argument and returned to the garage where Tiffany was, then Tiffany said "shoot me" immediately before the gun fired, and the gun was in contact with the front of Tiffany's head when she was shot. The act of "purposefully putting a gun to the fearful victim's head and pulling the trigger" is aggravated assault, not merely reckless conduct or pointing a pistol. *Jones v. State*, 289 Ga. 145, 148 (2011). See *Savage v. State*, 274 Ga. 692, 695 (2002) ("If the pointing of a firearm places the victim in reasonable apprehension of immediate violent injury, then the felony of aggravated assault, rather than the misdemeanor of [pointing a pistol], has occurred."); *Overton v. State*, 305 Ga. 597, 599–600 (2019) ("[T]he victim was in reasonable apprehension of immediately receiving a violent injury," an element of aggravated assault, based on the statements of witnesses that "just before hearing gunfire, they heard the victim say something to the effect of, 'Oh, you're going to shoot me now?'"). And aggravated assault is a felony that cannot serve as the unlawful act underlying a charge for involuntary manslaughter. See *Jones*, 289 Ga. at 148. In light of the record here, the trial court did not err by declining to instruct the jury on involuntary manslaughter by unlawful act. *Moon*, 311 Ga. at 424; *Chambliss*, 318 Ga. at 167.

(b) Scott's claim that the trial court should have instructed the jury on involuntary manslaughter by lawful act done in an unlawful manner also fails. Because Scott did not object to the absence of a jury charge on lawful act involuntary manslaughter, his claim related to that charge is reviewed only for plain error.

10

See *Jackson v. State*, 318 Ga. 393, 406 (2024). And to establish plain error, a defendant must show, among other things, that that the trial court committed a legal error that was not affirmatively waived. *Chambliss*, 318 Ga. at 165. But Scott affirmatively waived this alleged error by withdrawing his request to charge the jury on lawful act involuntary manslaughter. So he cannot establish plain error. See *Jackson*, 318 Ga. at 406.

*Judgment affirmed. All the Justices concur, except Warren, P.J., not participating.*

11